[No. S050455. Mar. 22, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN MICHAEL BEAMES, Defendant and Appellant.

908

**COUNSEL**

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Patrick J. Whalen, Carlos A. Martinez and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Defendant John Michael Beames was charged with one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of torture (§ 206), and one count of possession of a firearm by a felon (§ 12021,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

subd. (a)). He entered a plea of guilty on the firearm possession count. He also admitted allegations in the murder and the torture counts that he had been previously convicted of at least two felonies in California (§ 1203, subd. (e)(4)) and previously convicted of a serious felony offense (§ 667, subd. (a)). Thereafter, a jury found defendant guilty on the first degree murder count, and found true the special circumstance allegation that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). The jury also found defendant guilty on the torture count, and found true the allegation in this count that he personally inflicted great bodily injury. (§ 12022.7.) At the penalty phase of trial, the jury returned a verdict of death. Appeal to this court is automatic. (§ 1239, subd. (b).)

We find no prejudicial error at the guilt or penalty phase of defendant's trial. Accordingly, we affirm the judgment in its entirety.

## I. FACTS

### A. The Guilt Phase

Defendant lived with Angelita McMains and McMains's 15-month-old daughter, Cassie, and her infant son, Darrian. On January 19, 1994, Cassie bled to death due to a transection of her liver; that is, her liver had been hit so hard it was split nearly in two. The evidence at trial included medical testimony concerning the numerous physical injuries Cassie suffered in the weeks, days, hours, and minutes leading up to her death, and testimony from Cassie's natural father, defendant's siblings, McMains's father, and defendant himself.

#### 1. The Prosecution Case

Cassie was born on October 3, 1992, to McMains and Ricky Hager. Hager and McMains broke up a few months after Cassie's birth, and Hager did not live with them. In April 1993, defendant moved into McMains's rented home.

On or about June 14, 1993, Cassie suffered a broken leg. The location of the break and the degree of separation of the bones were unusual, indicating that a great deal of force created the fracture. When Dr. Joseph Gerardi examined Cassie on June 15, he noticed bruising around her injured leg bone, a large bruise under her chin, and multiple bruises on her upper arms.

McMains asked a friend, Cindy Clem, to say that Cassie had been injured at Clem's house. McMains said she did not want defendant implicated in Cassie's injury, because he had taken the blame for a prior incident in which a child had been injured.

When interviewed about Cassie's leg injury by an emergency response investigator from child protective services, defendant claimed he had been out of the vicinity when the injury occurred and had returned on June 15, 1993. Based on the suspicious nature of the injury, the sheriff's office removed Cassie from McMains's home on August 2, 1993. For the next four months, Cassie lived with McMains's parents and suffered no injuries.

On December 7, 1993, Cassie was released back to the home where McMains and defendant lived. Sometime after December 25, 1993, Hager's niece, Crystal Williams, noticed Cassie had a burn on her finger. In early January 1994, Hager saw Cassie with two "real bad black eyes." In explaining the black eyes, defendant told Hager that Cassie had fallen into a coffee table, but separately told Williams that Cassie had fallen from her crib or something. Also in January 1994, defendant's brother, John Phillip Beames, saw defendant squirt Cassie with liquid from a baby bottle and shake her roughly when she cried. Additionally, defendant's sister, Tammy Beames (Tammy),[2] observed over a period of a few days that Cassie appeared to be afraid of defendant.

From January 10 to January 14, 1994, McMains's infant son, Darrian, was hospitalized for a cough, difficulty in breathing, and a lack of weight gain. During this time, McMains stayed 24 hours a day with Darrian at the hospital.

On January 19, 1994, about 9:00 or 10:00 a.m., Hager and Williams went to visit McMains and defendant at their house. Hager gave McMains some methamphetamine to take to defendant, who was in a back room of the house. Defendant stayed in the back room, and he yelled at McMains to get Hager and Williams out of the house. Hager asked where Cassie was, and McMains replied she was with defendant. Hager left the house without seeing Cassie.

---

[2] Because a number of the witnesses share the Beames surname, we refer to defendant's sister as Tammy.

Sometime before 1:00 p.m. on January 19, 1994, Royce Hunneman, a neighbor, heard McMains and defendant arguing.

Around 1:00 or 1:30 p.m. that same day, McMains called defendant's sister, Tammy, and told her something was wrong. The two met on the road in their cars, and Tammy followed McMains back to McMains's home. When they got there, a county car was parked in front. McMains did not stop her car, and Tammy followed McMains past the home.

When McMains and Tammy returned to the house a little while later, defendant told Tammy that Cassie was dead. Defendant explained Cassie had gotten sick in her bed around 4:00 o'clock that morning. He sat Cassie down on the floor while he went to the bathroom to get clean sheets. When he came back, Cassie had fallen over and was lying in a pool of blood. Defendant said he had performed CPR (cardiopulmonary resuscitation) on Cassie for five hours, but she was dead. When Tammy asked about taking Cassie to the hospital, defendant said to give him a little bit of time. Similarly, when Tammy asked about contacting law enforcement, both defendant and McMains said, "No, give us a little bit of time."

Defendant told Tammy to take McMains and Darrian away and to go someplace where he could call them later. He said he would describe everything that had happened on a tape recording, which Tammy and McMains could later give to the police. Defendant refused to give Tammy a gun he had, saying he wasn't going to go alive.

Tammy and McMains went back to the house later that night, at a time when defendant was gone. McMains retrieved a tape recorder from the house, and she and Tammy listened to the recording. After McMains tried to erase a portion of the tape that involved a drug deal, they took the tape recorder to the hospital. There they gave the recorder to Deputy Sheriff Michael Strawser.

The tape recording included the following statements by defendant: "Angel, I love you very much. Please just try to believe me it was the truth, it was an accident. . . . I know this is going to kill you, baby. You know I love this little baby better than anything in the world."[3] Deputy Sheriff Strawser

---

[3] Defendant sometimes referred to Angelita McMains as "Angel."

listened to the tape, then went with McMains to her house. Once inside, Strawser saw what appeared to be blood in the bathroom and in the baby's crib.

Early the next morning, on January 20, 1994, Sergeant John Zapalac of the Tulare County Sheriff's Office went to look for defendant at the residence of David Joiner. When Zapalac arrived at the Joiner residence, defendant said he knew Zapalac needed to speak with him because of Cassie. When Zapalac asked where Cassie was, defendant said she was inside the car and handed Zapalac the car keys. Zapalac found Cassie's body inside of a jacket in the back of the car. Later, at the sheriff's department, defendant spontaneously stated, "I was the only one with her. I'm responsible. Put me in jail. Put a .45 to my head."

Dr. Armond Dollinger performed an autopsy on Cassie's body. He found nothing in Cassie's stomach, indicating she had not been fed for 24 hours before her death. Dr. Dollinger determined the cause of death was massive hemorrhaging due to a transected liver, and opined that Cassie's back was against a hard surface when she sustained that injury. Other physical injuries Cassie sustained within minutes, or at most within 24 hours of death, included multiple bruises on the face and abrasions on the back, fractures of the ribs, abrasions to the neck and shoulder on the left side, and a bruise and abrasion on the right side of the neck. It was Dr. Thomas Bennett's opinion, based on the character of the neck abrasions, that Cassie had been hung by the neck with a soft ligature for a period of time.

Dr. Dollinger observed numerous other physical injuries, some of which were days or weeks old, including dilation of the anal canal and scarring of the surrounding muscle, five broken ribs on the front right side, four broken ribs on the back left side, a bruise on the right front of the scalp, a large laceration of the top left side of the head, lacerations on the inside lower lip, contusions and abrasions around the nose and mouth, contusions, abrasions, and scratches on the back of the head, contusions, bruises, and abrasions on the back, and bruising on the tip of the tongue, the right thumb, and on the back of the knee.

Dr. Dollinger also saw various sets of burns to Cassie's body. There were burns to the buttocks in a crosshatched linear grid pattern, apparently caused by a floor furnace and occurring when Cassie wore no clothing and her legs

were forced wide apart. There also were burns in a grid-like pattern on the back of the right hand, third degree burns on the index and ring finger of the right hand, and burns on the back and ring finger of the left hand. Finally, burns were on the feet and third degree burns were on two of the toes.

### 2. *The Defense Case*

The defense contended Cassie suffered from osteogenesis imperfecta, a brittle bone disease that caused her to fracture with less trauma than an individual with normal bones. According to the defense, although abuse had occurred in the home, all of Cassie's burns and her fatal liver injury were accidental. The defense also showed that McMains hated and neglected Cassie, while defendant took care of Cassie and fed, changed, and clothed her.

Defendant testified in his own defense. He acknowledged convictions for armed robbery in 1973, receiving stolen property in 1975, and commercial burglary in 1983. He also admitted he used and sold methamphetamine while he was living with McMains, and claimed his and McMains's use of the substance affected their ability to be patient with others.

Defendant testified he was present in the home when Cassie sustained burns from the heating grate on the floor. McMains was not at home, and defendant was in bed when he heard Cassie screaming. She apparently had fallen on the hot grate and was "flopping around." Defendant grabbed Cassie by the shirt and pulled her off the grate as fast as he could. By then, McMains had returned home, and defendant expressed his being upset at her for "leaving the baby like that." He placed Cassie in some cool water in the bathtub, and told McMains to go buy some cream and salve for the burns. Defendant claimed this was the only time Cassie got burned by the grate.

Defendant also was present when Cassie died on January 19, 2004. At approximately 4:00 o'clock that morning, defendant heard Cassie crying. She had vomited in her crib, and defendant needed to remove the soiled sheets. He placed Cassie on the floor next to a little cart, so she could hold onto the cart while he changed the sheets. Defendant then went to get a washrag and some clean sheets and clothes for her. While in the bathroom, he heard the words, "Oh, fuck. Oh, fuck," and some clanging noise. Defendant rushed back to Cassie's room, where he saw McMains and a pool of blood all around Cassie. The cart, which had been laden with tools and propped up with a little pressure washer to keep it upright, had fallen on top of Cassie. Defendant started administering CPR, and McMains went to get a stethoscope. He listened for a heartbeat, but did not hear one.

During the days leading up to Cassie's death, defendant had been using drugs and staying up. He had been up for several days and was not thinking rationally after Cassie died. Although he knew somebody would be in trouble for the death, he did not call the police or an ambulance because there was no telephone in the residence. Defendant left a tape recording because he felt responsible for Cassie's death, having initially sat Cassie on the floor. He also did not want McMains, who he thought was pregnant again, or Darrian, to get into trouble. Defendant claimed he told his sister, Tammy, on the day Cassie died, that a cart of tools had fallen on Cassie. After the incident, defendant told David Joiner he was going to hell for what had happened.

Defendant denied torturing Cassie or breaking her leg. He claimed she fell on the heating grate only once, and he did not recall her having two black eyes prior to her death.

In 1983, defendant pled no contest to a charge of breaking Ricardo McVey's leg, even though he was not absolutely sure he broke it. He admitted, however, that he slapped McVey up against a garage door.

B. *The Penalty Phase*

1. *The Prosecution Case*

The prosecution relied on the circumstances of the instant crime and evidence of defendant's prior felony convictions. The prosecution also introduced the following evidence of prior violent criminal activity.

On March 25, 1973, defendant robbed the clerk of a Sacramento convenience store at gunpoint.

In 1974, defendant was married to Catherine Scrima. They were married for approximately three years and had a daughter. Defendant was verbally and physically abusive to Scrima. On their wedding anniversary, he had "a fit" about going to Scrima's company party and placed his hands on Scrima's throat and choked her. On a separate occasion, on Christmas day, Scrima was wearing defendant's boots and refused defendant's command to take them off. He hit her in the face twice, causing a fat lip and a black eye. Although defendant threatened he could have Scrima "eliminated" for $10 if she ever left him and Scrima took this threat seriously, she left defendant after the Christmas incident. Scrima remains afraid of defendant.

Ronald Gadberry was defendant's best friend. Gadberry's parents last saw him alive on October 30, 1984. At that time, Gadberry said he was going to defendant's place of business to collect some money that defendant owed him.

Defendant owed Gadberry $1,000. In early December 1984, Gadberry's father went looking for Gadberry at defendant's shop. There he saw Gadberry's car parked in front, but defendant claimed he had not seen Gadberry in months. In January 1985, law enforcement officers found Gadberry's body inside the trunk of his car, which was parked in Rodeo, California. He had been shot in the back of the head, and the bullet had lodged in his brain. Defendant told an investigator during a January 1985 interview that he had not seen Gadberry for approximately five or six months. Two witnesses, however, testified that defendant implicated himself in the killing, and two others testified that defendant claimed he used a firearm to shoot a person in self-defense. One latent print lifted from the inside passenger window of Gadberry's car was identified as having been made by defendant's left middle finger, but the age of the print could not be determined.

On one occasion, defendant appeared uninvited at the home of Kristi McVey, the mother of his son. Although McVey and Cheryll Cuslidge pushed a couch up against the front door to block defendant's entrance, he got into the residence through a window. Once inside, he held a knife and pointed it at McVey. Cuslidge did not see the knife, but she did see defendant grab McVey around the neck. The telephone lines had been cut, so Cuslidge had to leave the house to call the police. Defendant had been using methamphetamine around this time period.

During 1982 or 1983, Douglas Shupe stored his paving equipment in defendant's yard, and in exchange paid part of the yard costs. Shupe became concerned that defendant took in a lot of vehicles containing large quantities of methamphetamine, and Shupe attempted to terminate their relationship when defendant told him he was doing it for the "Hell's Angels." When Shupe later tried to get his paving equipment back, defendant held a loaded gun to Shupe's forehead and told him, "You aren't taking anything out of here, you're going to leave it here, you're going to go and I don't want to see you no more." Shupe left and called the sheriff's department. Shupe subsequently recovered his property from defendant when the police were at the yard.

Cassie's grandfather (McMains's father) testified that Cassie's death tore their family apart, and that his wife took the death "very hard." Cassie's half brother and half sister felt bad because they never took the opportunity to see Cassie while she was alive.

### 2. The Defense Case

The defense called a number of witnesses, including defendant's friends, siblings and other relatives, and one former spouse (Connie Bergstrom), who

testified that defendant was very kind and playful toward children, that he was protective of children and interacted well with them, and that he was very generous toward others. These witnesses claimed that they never saw defendant abuse or hurt his two older daughters or any other any child, and that they did not believe defendant could have murdered Cassie. They also testified that if defendant were to be executed, it would affect the families of his siblings immensely and devastate them.

## II. DISCUSSION

### A. Pretrial and Juror Selection Issues

#### 1. Denial of Continuance

Defendant and McMains were initially charged as codefendants. In December 1994, the matter was set for a jury trial to begin on April 3, 1995. Thereafter, the trial court granted severance of defendant's trial, and subsequently continued his trial to July 24, 1995. McMains's trial proceeded first, but did not conclude by July 24. Consequently, defendant's trial was put over one week until July 31. The jury rendered a guilty verdict in McMains's trial on July 28, 1995, three days before defendant's trial was scheduled to commence.

Meanwhile, on July 27, 1995, defendant filed a motion to continue his trial for seven weeks to September 18, 1995. Defendant sought the continuance so he could conduct a public opinion survey to assess the impact of the media's recent coverage of McMains's trial. In support of the motion, defense counsel filed a declaration stating that he had contacted an expert to conduct and complete a survey by September 5, that he expected the survey to show defendant could not receive a fair trial in Tulare County given the recent publicity, and that he would file a motion to change venue to be heard by the September 5 date.[4] The prosecution filed opposition on the grounds that nine previous continuances in the case had already caused undue delay, that defendant failed to demonstrate good cause for another continuance, and that a continuance would work a hardship to the People with regard to 40 potential witnesses subpoenaed for the trial, some of whom were out of state. On July 31, 1995, the date set for trial, the trial court held a hearing on the motion to continue, at which time defendant challenged the prosecution's

---

[4] Pursuant to section 1033, a defendant's motion to change venue shall be granted "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) The factors relevant to making this determination are: (1) the nature and gravity of the offense; (2) the nature and extent of the media coverage; (3) the size of the community; (4) the community status of the defendant; and (5) the prominence of the victim. (*People v. Ramirez* (2006) 39 Cal.4th 398, 434 [46 Cal.Rptr.3d 677, 139 P.3d 64].)

contentions regarding undue delay and lack of good cause. Defendant, however, made no reference to the People's claimed hardship regarding subpoenaed witnesses. After hearing arguments from both sides, the trial court denied defendant's motion, explaining it could best evaluate defendant's ability to get a fair trial in the county through the juror voir dire process. The court, however, expressed an open mind on the matter, stating it "certainly would agree that if we cannot find twelve jurors to sit here neutrally and listen to the case, then counsel's motion may be well taken." The court reiterated this point in making its ruling: "If we begin picking a jury [and] it turns out we cannot get twelve people that can be fair in this case, then, obviously, we'll have to back up and reconsider what's going on. Short of that, I'm going to deny the motion at this time . . . ." Later that same day, defendant's trial commenced.

On appeal, defendant contends the trial court abused its discretion in refusing to grant a 35-day (five-week) continuance.[5] Although a survey is not required in order to make or support a motion to change venue (see *ante*, fn. 4), defendant claims he needed a survey to demonstrate that the media coverage of the pretrial proceedings and McMains's just concluded separate trial had tainted the jury pool. He asserts his continuance motion was diligently made, supported by good cause, and necessary to establish grounds for a venue change, but the trial court denied the motion based solely on its desire to try defendant immediately after McMains. That ruling, he argues, deprived him of his federal constitutional rights to present witnesses, a fair trial, due process of law, an impartial jury, effective assistance of counsel, and a reliable penalty determination.

█ As defendant acknowledges, the decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 [39 Cal.Rptr.2d 607, 891 P.2d 153]; *People v. Howard* (1992) 1 Cal.4th 1132, 1171 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. (*People v. Beeler, supra,* 9 Cal.4th at p. 1003.)

Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. (See *People v. Jones* (1998) 17 Cal.4th 279, 318 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People v. Froehlig* (1991) 1 Cal.App.4th 260, 265 [1 Cal.Rptr.2d 858].)

---

[5] Defendant apparently calculates this time period as beginning on July 31 (the scheduled trial date) and ending on September 5 (the date when he asserted his survey would be complete and his motion to continue could be heard). As indicated, however, defendant's written motion specifically sought to have the trial continued to September 18.

Moreover, the denial of a continuance may be so arbitrary as to deny due process. (See *People v. Frye* (1998) 18 Cal.4th 894, 1013 [77 Cal.Rptr.2d 25, 959 P.2d 183].) However, not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence. (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921, 84 S.Ct. 841].) Although "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality[,] . . . [t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." (*Id.* at p. 589.) Instead, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (*Id.* at p. 589, citation omitted; see *People v. Howard, supra,* 1 Cal.4th at p. 1172 [quoting same].)

Even assuming, for purposes of argument, that defendant was diligent in bringing his motion given the recent publicity in McMains's case,[6] we find ample support in the record for the trial court's decision to deny the requested continuance and to proceed with voir dire as a means for evaluating whether defendant could obtain a fair trial in Tulare County. Defendant's trial had been scheduled to begin that very day, and the prosecution had already issued subpoenas to its 40 potential witnesses. At the hearing, defendant did not refute the prosecutor's claim that the requested delay would cause hardship with regard to these witnesses, some of whom were out of state.[7]

By that time, moreover, the trial court and the parties had already developed a juror questionnaire that took into account the recent completion of McMains's trial and posed questions relating to the pretrial publicity of the case. As the court pointed out, the questionnaire would ask potential jurors whether they had heard of and/or formed any opinions about the case, and then they could be questioned regarding their responses. The court essentially reasoned that, once it engaged in or completed the voir dire process, it would be in a better position to determine whether defendant could receive a fair trial because it would know the extent to which the selected jury had actually

---

[6] Defendant argued in the proceedings below that it would not have been possible to file his motion sooner than July 27, 1995 because the publicity complained of did not occur until the few days preceding that date. Conversely, the People point out that all parties were aware in March 1995 that defendant's trial would immediately follow McMains's trial; indeed, defendant acknowledges in his opening brief that "it was readily predictable at the time appellant's trial was set that the *McMains* trial would generate publicity that was specifically and pervasively prejudicial to appellant." Again, we observe a public opinion survey was not required to establish the factors supporting a change of venue. (See *ante,* fn. 4.)

[7] Defendant asserts the trial court did not refuse the requested continuance because of the potential prejudice to the prosecution. The record does not establish this; it merely reflects the court did not specifically refer to the prosecution's claim of hardship in denying the motion.

heard of defendant's case and the prejudicial impact of the pretrial publicity regarding defendant and his alleged crimes. (Accord, *Odle v. Superior Court* (1982) 32 Cal.3d 932, 943–944 [187 Cal.Rptr. 455, 654 P.2d 225].) Under the circumstances presented, we cannot say the trial court's refusal to continue the trial for seven (or five) weeks constituted a judicial abuse of discretion or denied defendant due process.[8]

■ In reaching this conclusion, we do not suggest that trial courts may deny motions to change venue solely on the theory that jury voir dire is a better method of assessing the need to change venue. As defendant points out, all defendants have the right to seek a change of venue under section 1033, and we do not hold the mere availability of jury voir dire is sufficient to deprive a defendant of that right. (Cf. *Groppi v. Wisconsin* (1971) 400 U.S. 505, 511 [27 L.Ed.2d 571, 91 S.Ct. 490] [finding unconstitutional a state law that categorically prevented a change of venue for misdemeanor jury trials, regardless of the extent of local prejudice against the defendant charged].) Here, however, defendant did not actually move for a change of venue; rather, he moved for a seven-week continuance on the eve of trial in order to explore the need for a venue change. The record does not establish a violation of defendant's rights under section 1033.

■ In any event, we observe defendant did not exhaust his peremptory challenges and did not object to the jury's final composition. Under settled case law, such omissions are deemed to signify a recognition that the jury as selected was fair and impartial, and are decisive in rejecting claims alleging improper denial of a motion to change venue. (*People v. Daniels* (1991) 52 Cal.3d 815, 854 [277 Cal.Rptr. 122, 802 P.2d 906].) It therefore follows that when a defendant unsuccessfully moves for a continuance in order to investigate and prepare for a motion to change venue, his subsequent failure to exhaust peremptory challenges and failure to object to the jury's final composition signify a similar recognition regarding the jury as impaneled and likewise support rejection of the claims alleging wrongful denial of the continuance and related constitutional violations. (Cf. *People v. Parker* (1965) 235 Cal.App.2d 100, 106 [44 Cal.Rptr. 909] (*Parker*).)

The facts before us are substantially similar to those in *Parker, supra*, 235 Cal.App.2d 100, in which the defendant, at the opening of his trial for embezzlement, requested a continuance of the trial on the ground that adverse

---

[8] Nor can we conclude the trial court improperly refused to allow the defense to obtain and present expert witness testimony relating to pretrial publicity, as defendant contends. The trial court stated that, in light of the anticipated jury voir dire, it did not "think" it "need[ed] a survey conducted by some non-lawyers who are conducting a telephone book type of survey to people at large." As the record discloses, however, the court did not purport to foreclose the defense from having an expert conduct a survey in tandem with the voir dire process or from later offering expert testimony on the topic.

publicity appeared prominently in the newspapers, television, and radio regarding the fact of his conviction of theft by false pretenses in a separate trial that concluded just the day before. (*Id.* at pp. 102–103.) In *Parker*, the trial court noted that both sides were ready to proceed on the trial date originally set, that the defendant had received newspaper publicity preceding and throughout the first trial, that the publicity's effect upon the forthcoming trial could be investigated by means of the voir dire examination of prospective jurors, and that the motion for a continuance would be denied " 'at this time.' " (*Id.* at p. 103.) After the voir dire examination had concluded, defense counsel left half of his peremptory challenges unexercised, and notwithstanding the trial court's denial of the continuation request " 'at this time,' " counsel did not renew his motion or object to continuing with the trial. (*Id.* at pp. 105–106.) In light of these circumstances, the appellate court found there was no abuse of discretion in the rejection of the continuance request and no denial of a fair trial. (*Id.* at p. 106.)

We note *Parker* contrasted the offenses charged there, which were economic in nature and "not particularly 'juicy,' " with other types of offenses that, for example, involve "lurid violence or rampant sexuality" and thereby "attract vastly more attention and tend to excite more public hostility." (*Parker, supra,* 235 Cal.App.2d at p. 105.) Here, however, even assuming the first degree murder and torture charges against defendant fall within this latter category of offenses, we find *Parker*'s reasoning—which upheld the denial of the continuance request after taking into account the timing of the two trials, the trial court's willingness to explore the matter of pretrial publicity during the voir dire process and to leave the door open for a renewed motion, and the defendant's failure to exhaust his peremptory challenges or to voice objection to continuing with the trial after the voir dire—fully supports our conclusion that a similar result is warranted here.

Relying principally on *Sheppard v. Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507] (*Sheppard*), and *Williams v. Superior Court* (1983) 34 Cal.3d 584 [194 Cal.Rptr. 492, 668 P.2d 799] (*Williams*), defendant makes the related contention that the trial court violated its duty to take all reasonable measures to ensure a fair and impartial jury when it initially scheduled his trial to immediately follow McMains's trial and then failed to continue the trial on its own motion. The violation of this duty, he claims, impaired his federal constitutional rights to a fair trial, an impartial jury, and a reliable penalty determination.

We reject these related claims for the reasons already given, and additionally on the ground that a trial court generally is under no obligation to continue a matter for the defense in the absence of a request. (E.g., *People v. Medina* (1995) 11 Cal.4th 694, 739 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Alcala* (1992) 4 Cal.4th 742, 782 [15 Cal.Rptr.2d 432, 842 P.2d 1192].)

*Sheppard, supra*, 384 U.S. 333, and *Williams, supra*, 34 Cal.3d 584, do not compel otherwise. The facts of this case do not compare to those in *Sheppard*, in which the United States Supreme Court looked beyond the pretrial publicity generated in the defendant's case to find that the massive, pervasive, and inflammatory publicity that attended the actual trial, coupled with the carnival atmosphere at the trial itself, prevented the defendant from receiving a fair trial consistent with the federal due process clause. (See *Sheppard, supra*, 384 U.S. at pp. 355 ["bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard"], 356–357 [much of the inflammatory material broadcasted or printed during the trial was never heard from the witness stand but nonetheless reached some of the jury].) Moreover, the procedural posture of this case is different from that in *Williams*, where the defendant actually moved for a change of venue and sought writ relief based on the trial court's denial of his motion. (*Williams, supra*, 34 Cal.3d at p. 587.) Although *Williams*'s analysis perhaps suggests that factors supporting a continuance or a venue change may have been present here, that decision does not stand for the proposition that pretrial publicity may require a continuance of a trial without a defense request, or that a reversal on venue-related grounds may be compelled even though the defendant failed to exhaust his peremptory challenges and neglected to object to the jury's final composition.

### 2. *Denial of Challenges for Cause*

Defendant contends the trial court erroneously refused to excuse six biased jurors for cause, thereby denying his federal constitutional rights to a fair and impartial jury, due process of law, and a reliable penalty determination.

" 'To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so.' " (*People v. Ramirez, supra*, 39 Cal.4th at p. 448; see also *People v. Avila* (2006) 38 Cal.4th 491, 539 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Here, the defendant did not make a peremptory challenge to any of the six jurors (K.H.; D.B.; R.O.-H.; B.C.; M.A.; S.S.) who he claims should have been excused for cause; neither did he exhaust his available 20 peremptory challenges. (Code of Civ. Proc., § 231, subd. (a).) The defendant did not express displeasure with the jury as selected, and he did not object to the jury's composition. Moreover, he makes no attempt to justify his failure to do so. Accordingly, this issue has not been preserved for review.

Even assuming the claim had been properly preserved, we would find it lacking in merit. Apart from R.O.-H., none of the five other allegedly biased

individuals actually served on the defendant's jury and so they could not have possibly affected the jury's fairness. (*People v. Avila, supra,* 38 Cal.4th at p. 540; see *People v. Farnam* (2002) 28 Cal.4th 107, 133 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

■ With regard to Juror R.O.-H., the governing law provides: " 'A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would " 'prevent or substantially impair' " the performance of the juror's duties as defined by the court's instructions and the juror's oath.' [Citations.] 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.]' [Citation.] On appeal, we will uphold the trial court's decision if it is fairly supported by the record, and accept as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has given conflicting or ambiguous statements. [Citations.]" (*People v. Farnam, supra,* 28 Cal.4th at p. 132, fn. omitted.)

Although some of Juror R.O.-H.'s comments during the voir dire process could be construed as suggesting she might automatically vote for death at the penalty phase, other remarks she made indicated an ability and a willingness to be fair and open-minded. For instance, after candidly saying she initially had formed an opinion of defendant's guilt after reading a newspaper story about McMains's trial, R.O.-H. stated: "But after listening to the judge speak earlier about the duties of a juror, I don't know if I hold the same opinion or not." She also commented that "[a] newspaper article, I know isn't written—I know it's not, you know, the truth." Finally, although she stated in response to defense counsel's questioning that she would need to hear evidence to overcome her suspicion of defendant's guilt, she later expressed her understanding that, under the law, everyone is presumed innocent until proven guilty. She also promised to base her decision "solely upon the evidence that is presented" and to follow the law as the judge instructs. Given R.O.-H.'s conflicting statements, and the trial court's unique opportunity to evaluate her credibility as she spoke, we shall defer to that court's determination regarding her true state of mind. Indeed, the defense evidently agreed at the conclusion of voir dire questioning that R.O.-H.'s views would not prevent or substantially impair the performance of her duties as a juror, for it declined to exercise an available peremptory challenge against her.

B. *Guilt Phase Issues*

Defendant contends the trial court's erroneous failure to instruct the jury on the lesser included offenses of second degree murder and involuntary manslaughter deprived him of his federal constitutional rights to a fair trial,

due process of law, trial by jury, and a reliable penalty determination. With regard to this claim, we understand defendant to argue the trial court should have instructed on all three theories of second degree murder, that is, unpremeditated murder with express malice, implied malice murder, and second degree felony murder.

 "A court must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so. [Citation.]" (*People v. Horning* (2004) 34 Cal.4th 871, 904–905 [22 Cal.Rptr.3d 305, 102 P.3d 228] (*Horning*); see *People v. Valdez* (2004) 32 Cal.4th 73, 115 [8 Cal.Rptr.3d 271, 82 P.3d 296].) "[T]he sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Here, however, we need not decide whether the evidence warranted instructions on second degree murder and involuntary manslaughter, because we find any error both invited and harmless.

After defendant testified at the guilt phase, the trial court and the parties discussed proposed guilt phase jury instructions. With the agreement of both sides, the court stated it would instruct the jury with the applicable versions of CALJIC Nos. 8.00 (homicide—defined), 8.10 (murder—defined), 8.11 ("malice aforethought"—defined), 8.24 (murder by torture), 8.30 (unpremeditated murder of the second degree), and 8.31 (second degree murder—killing resulting from unlawful act dangerous to life). The court then asked the defense whether it wanted the jury instructed on the lesser included offense of second degree murder, based on the second degree felony-murder rule, pursuant to CALJIC No. 8.32 (second degree felony murder).[9] Defense counsel said no. In doing so, counsel expressed his understanding that instructions on second degree murder as a lesser included offense of first degree murder were required sua sponte.

Shortly thereafter, the trial court assented to the defense's request for instructions on the lesser included offense of involuntary manslaughter pursuant to CALJIC Nos. 8.45 (involuntary manslaughter—defined), 8.46 (due caution and circumspection—defined), 8.50 (murder and manslaughter

---

[9] At this hearing, there was discussion of a second degree felony-murder instruction with child abuse serving as the underlying felony. On appeal, defendant does not contend the failure to give such an instruction was error; rather, he asserts that, at the time of the crimes, second degree felony murder based on the predicate felony of torture (§ 206) constituted a lesser included offense of first degree murder by torture, and that instruction on this theory was required. Without deciding the merits of this theory (cf. *People v. Cole* (2004) 33 Cal.4th 1158, 1219–1220 [17 Cal.Rptr.3d 532, 95 P.3d 811]), we accept it for purposes of addressing defendant's contentions on appeal.

distinguished), and 8.51 (murder and manslaughter distinguished—nature of act involved). Subsequently, however, defense counsel asserted: "If it turns out I don't want involuntary manslaughter, this isn't something that you have to give if I waive it." The court agreed the defense could waive instructions on this lesser included offense, but cautioned counsel that "if you do wish to do so, you have to make it clear on the record, and I'll go over that very thoroughly." The next court day, counsel informed the court that the defense was not requesting any instructions on the lesser included charges of second degree murder and involuntary manslaughter in connection with the murder count. In response to the court's inquiry, counsel represented his decision was "a matter of trial strategy." Counsel clarified, however, that the defense wanted the court to instruct on the lesser related offense of child endangerment (CALJIC No. 9.37), with regard to the torture count.

After all the evidence was presented and both sides rested, defense counsel expressed concern that the testimony of the prosecution's rebuttal witness, Dr. Dollinger, "might necessitate giving the lesser of the second." Counsel asked for some time to discuss the issue privately with defendant, which the trial court permitted. When the proceedings reconvened, counsel stated: "We don't want any lessers given with Count 1. I discussed it with John. I told him the reasons lawyers often want to do that, it gives them a chance to compromise if they feel like somebody did something wrong. He explains to me none of the actual legal theory this a second or involuntary could be based on the truth that he did not kill this baby, the cart fell on it. We don't want the lessers." In accordance with the defense's requests, the trial court did not instruct the jury on any theory of second degree murder or involuntary manslaughter.

■ " '[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.] In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction.' " (*Horning*, *supra*, 34 Cal.4th at p. 905, quoting *People v. Barton* (1995) 12 Cal.4th 186, 198 [47 Cal.Rptr.2d 569, 906 P.2d 531].) ■ Here, the record clearly reflects that defendant and his counsel expressed a deliberate tactical purpose in resisting instructions on second degree murder and involuntary manslaughter, the very instructions he now complains should have been given. The circumstances here were substantially similar to those in *Horning*, which found invited error where a capital defendant and his counsel insisted at trial they did not want instructions on the lesser included offenses of second degree murder and manslaughter because they were inconsistent with the defense that the defendant did not commit the crime at all. (*Horning*, *supra*, 34 Cal.4th at p. 905.) Consistent with *Horning*, we find that any error on these theories was

invited, and that defendant therefore is barred from invoking such error as a basis for reversing his conviction. Moreover, we are not persuaded to forgo application of the invited error doctrine based on the mere fact that defense counsel did not discuss the elements or the possible merits of these particular lesser included offenses in more depth than he did while addressing the court about the instructions.

In any event, again assuming error with regard to any or all of the omitted instructions, it also was harmless. As our decisions explain, " '[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 392 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *Horning, supra,* 34 Cal.4th at p. 906; see *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People v. Breverman, supra,* 19 Cal.4th at p. 165.) Here, the jury was properly instructed that a torture-murder special circumstance requires the intent to kill.[10] (See § 190.2, subd. (a)(18); *Chatman, supra,* 38 Cal.4th at p. 392.) When the jury found this special circumstance true, it necessarily determined that defendant intended to kill Cassie when he tortured her. Thus, there was no prejudice resulting from any erroneous failure to instruct on second degree felony murder (see *People v. Blair* (2005) 36 Cal.4th 686, 747 [31 Cal.Rptr.3d 485, 115 P.3d 1145]) or involuntary manslaughter (see *Chatman, supra,* 38 Cal.4th at p. 392). Likewise, in finding the killing was intentional, the jury necessarily found express, not implied, malice. (Accord, *People v. Combs* (2004) 34 Cal.4th 821, 857 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) Accordingly, any error in failing to instruct on implied-malice second degree murder also was harmless.

Defendant contends the jury's true finding on the torture-murder special-circumstance allegation did not render the failure to instruct on second degree felony-murder harmless because the finding left open certain factual questions posed by the omitted second degree felony-murder instruction. This contention fails to warrant a reversal.

■ "If a jury is not satisfied that a defendant acted with either express or implied malice, it may find the defendant guilty of *second degree* murder on

---

[10] The court instructed: "To find that the special circumstance referred to in these instructions as murder involving infliction of torture is true, each of the following facts must be proved: [¶] One, the defendant intended to kill, or with intent to kill, aided and abetted in the killing of a human being. [¶] Two, the defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose. [¶] And, three, the defendant did inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture."

a felony murder theory." (*People v. Blair, supra,* 36 Cal.4th at p. 745 [addressing failure to instruct on second degree felony murder as a lesser included offense of first degree murder by poison, where jury found true a special circumstance allegation of murder by poison].) Here, as indicated, the true finding on the torture-murder special-circumstance allegation shows that the jury was satisfied defendant acted with express malice, and that it necessarily rejected any theory that defendant intended only to torture Cassie and not to kill her. In view of these circumstances, any error in failing to instruct on second degree felony-murder was harmless. (See *People v. Blair, supra,* 36 Cal.4th at p. 747.)

Additionally, we conclude that any error in failing to instruct on the second degree murder theory of unpremeditated murder with express malice (CALJIC No. 8.30) was harmless. As the record discloses, the evidence supporting the jury's verdict of guilt of first degree murder by torture was so relatively strong, and the evidence supporting a different outcome was so comparatively weak, that there is no reasonable probability that the claimed error affected the result. (*People v. Breverman, supra,* 19 Cal.4th at p. 177 [applying *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]]; see also *People v. Rogers* (2006) 39 Cal.4th 826, 870 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Here, the evidence supporting the guilt verdict included medical testimony establishing that a number of Cassie's injuries were inflicted only hours or minutes before her death, including multiple facial bruises, rib fractures, and abrasions to the shoulder and back. More significantly, the evidence showed that a soft ligature was used to hang Cassie by the neck for a period of time before she was killed, and that Cassie survived this ordeal but then died from a final blow of such immense force and impact that it split her liver in two. The number, character, and successive nature of the injuries leading up to and culminating in Cassie's death provided strong evidence that defendant acted with premeditation both in torturing and in killing her.

By contrast, there was no evidence showing that defendant acted without premeditation at the time of the killing; instead, defendant maintained throughout the trial that he was out of the room when a tool-laden cart fell on Cassie. On appeal, defendant points to the evidence of his intolerance of crying children, and argues it supported an inference that "he could well have snapped when Cassie started crying." But any inference that Cassie died of an impulsive act would have been seriously undercut by the evidence that Cassie, who was a mere 15 months old, suffered a multitude of injuries and was hung by the neck in the minutes and hours before the fatal blow that transected her liver. Also undermining such an inference was the backdrop of other evidence showing that, in the prior days, weeks, and months, Cassie was constantly injured while living in the home with defendant. Her black eyes, multiple sets of burns, broken leg, broken ribs, and numerous bruises, contusions, lacerations, and abrasions all strongly indicated a pattern of

conduct that was consistent with what occurred on the day of the killing. Given the relative strength of the evidence of first degree murder, and the relative weakness of the evidence to the contrary, we do not find it reasonably probable that had the jury been instructed on this theory of express-malice second degree murder, it would have concluded defendant intended to kill Cassie without premeditation or deliberation.

Finally, defendant contends *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382] and its progeny have established a rule of constitutional law that, where the evidence supports instructions on lesser included offenses in a capital case, the trial court cannot refuse them and a defendant cannot waive them. As we have explained, however, " '*Beck* does not prohibit a criminal defendant [in a capital case] from choosing to forgo such instructions for strategic reasons . . . .' " (*Horning, supra*, 34 Cal.4th at p. 906, quoting *People v. Hardy* (1992) 2 Cal.4th 86, 185 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Moreover, and in any event, *Beck*'s principles are not violated where, as here, the jury was provided with the noncapital option of first degree murder without special circumstances. (*Horning, supra*, 34 Cal.4th at p. 906; see *People v. Sakarias* (2000) 22 Cal.4th 596, 621, fn. 3 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

We find no reversible state or constitutional error at the guilt phase.

## C. *Penalty Phase Issues*

During the penalty phase deliberations, the jury submitted the following written questions to the trial court. "Life in Prison? Dose [*sic*] life in prison without parole really mean without parole forever? What priviledges [*sic*] would he have? family visitations? girl friends? isolation or general population? Death Row? Do you get visitors? Are you ever with any of the other inmates for meals or exercise?" The court informed the prosecution and the defense of these inquiries. After discussing the matter for several minutes, the court indicated it would hear more from the parties and resolve the issue the following morning in a hearing outside the jury's presence.

At the hearing, the defense argued against informing the jury about the Governor's power of commutation because: (1) it would be misleading to tell the jury about commutation during deliberations when the topic had not been discussed during voir dire; (2) instructing the jury on commutation would impair defense counsel's credibility because he had already informed the jury a life sentence meant that defendant would never get out of prison; and (3) if the court were to tell the jury about commutation, it should also indicate that a commutation in a capital case had never before occurred.

The trial court expressed its concern that "the danger is, as I see it, we get the jury back there, if you don't tell them that the [G]overnor has commutation power and that this power applies to both types of sentences, then we get a juror back there who insists perhaps that there is such a thing and they get speculating and it does more harm than good." Accordingly, the court decided to give the jury the following written response: "This response is in respect to the questions asked relative to whether life in prison without parole actually means the defendant would never be released from prison and inquiries in respect to prison life should the defendant receive either a sentence of life without parole or the death penalty. [¶] The Governor has commutation power and this commutation power applies to both sentences, that of life in prison without parole and the death penalty. However, the jury is not to consider this commutation power in arriving at a verdict in the penalty phase. The jury must not assume anything other than death means death by execution and life without parole means imprisonment for the rest of the defendant's natural life. [¶] In arriving at a verdict in the penalty phase the jury is not to speculate or consider living conditions in the prison as these are matters which must not affect your verdict in any way."

Defendant contends the trial court improperly instructed the jury regarding the Governor's commutation power and thereby violated his federal constitutional rights to a reliable penalty determination, a fair penalty trial, and due process. We disagree.

■ Generally, reference to the commutation power is improper because it "invites the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination." (*People v. Ramos* (1984) 37 Cal.3d 136, 155 [207 Cal.Rptr. 800, 689 P.2d 430].) However, "[w]hen the jury makes a specific inquiry about how a postconviction proceeding such as commutation might affect defendant's sentence, we have suggested that trial courts issue a short statement emphasizing that it would be a violation of the jury's duty to consider the possibility of commutation in determining the appropriate sentence." (*People v. Benavides* (2005) 35 Cal.4th 69, 115 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) It is now firmly established that a court in a capital case does not err when it answers a jury question generally related to the commutation power by instructing—as suggested in *People v. Ramos, supra,* 37 Cal.3d at page 159, footnote 12—that the Governor may commute either a death sentence or a life without possibility of parole sentence, but that the jury must not consider the possibility of commutation in determining the appropriate sentence. (*People v. Hines* (1997) 15 Cal.4th 997, 1073 [64 Cal.Rptr.2d 594, 938 P.2d 388]; see *People v. Davis* (1995) 10 Cal.4th 463, 547–548 [41 Cal.Rptr.2d 826, 896 P.2d 119]; see also *People v. Ledesma* (2006) 39 Cal.4th 641, 737 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Here, the court's responses to the jury's inquiries conformed to this

principle. No error or constitutional violation appears, and we decline defendant's invitation to reconsider our decisions on the matter.

Defendant asserts the trial court should not have instructed on commutation, because the jury did not specifically ask about the Governor's commutation power but, rather, inquired about parole. We have held, however, that commutation instructions are properly given when the jury *implicitly* raises the issue of commutation. (E.g., *People v. Hines, supra,* 15 Cal.4th at p. 1073 [jury did not explicitly refer to commutation, but asked whether its penalty could be modified " 'through any part of the appeal process' "]; *People v. Hunter* (1989) 49 Cal.3d 957, 981 [264 Cal.Rptr. 367, 782 P.2d 608] [jury asked, " 'under what circumstances could [defendant] be released from prison?' "].) Here, the issue was implicit in the jury's question whether "life in prison without parole really mean[s] without parole forever?" (See *People v. Whitt* (1990) 51 Cal.3d 620, 657, fn. 29 [274 Cal.Rptr. 252, 798 P.2d 849].) Accordingly, the trial court properly instructed the jury that the Governor has the power to commute either a death sentence or a sentence of life without possibility of parole, that it would be improper to consider commutation in determining the appropriate penalty, and that "[t]he jury must not assume anything other than death means death by execution and life without parole means imprisonment for the rest of the defendant's natural life."

Defendant additionally contends on appeal that, given his three prior felony convictions at the time of trial, the trial court's instruction was grossly misleading and violated federal constitutional standards because it failed to inform the jury that commutation was possible for a twice-convicted felon only with the agreement of four California Supreme Court justices (see Cal. Const., art. V, § 8, subd. (a)) and only upon consultation with the Board of Prison Terms (§§ 4802, 4812, 4813). At trial, however, defense counsel never suggested that a failure to mention these limitations on the Governor's commutation power would be misleading in light of his felon status. But even assuming the issue may be raised on appeal, it is properly rejected on the merits. As our prior decisions make clear, " '[t]here [is] no need to discuss the law of commutation exhaustively and good reason not to stress defendant's record.' " (*People v. Hines, supra,* 15 Cal.4th at p. 1074; see also *People v. Martinez* (2003) 31 Cal.4th 673, 698 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *People v. Whitt, supra,* 51 Cal.3d at p. 657.)

Contrary to defendant's assertions otherwise, *McLain v. Calderon* (9th Cir. 1998) 134 F.3d 1383 and *Hamilton v. Vasquez* (9th Cir. 1994) 17 F.3d 1149 do not support a finding of reversible error where, as here, the trial court's comments were sufficient to advise the jurors not to consider the speculative possibility of commutation at all in arriving at their sentencing determination. (See *People v. Hart* (1999) 20 Cal.4th 546, 656–657 [85 Cal.Rptr.2d 132,

976 P.2d 683].) As indicated, the court properly emphasized to the jurors that they "must not assume anything other than death means death by execution, and life without parole means imprisonment for the rest of the defendant's natural life," and that they were "not to consider this commutation power in arriving at a verdict in the penalty phase." Thus, even assuming the court should have more completely explained the limitations on the Governor's commutation power for a twice-convicted felon such as defendant, its failure to do so was insignificant (because the specific details of the commutation process bore no relevance to the jury's task), and there is no reasonable possibility that the perceived incompleteness of the court's comments affected the result. (*Ibid.*)

Finally, defendant asserts the trial court violated his federal constitutional rights by refusing his request to advise the jury that no death sentence or sentence of life without possibility of parole had ever been commuted since adoption of the present death penalty statute. In a similar vein, he complains he "had no opportunity to offer evidence and/or argument on the issue of the likelihood of commutation." These complaints are devoid of merit because, as indicated, consideration of the possibility of commutation is improper in capital penalty phase determinations. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1077 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; see *People v. Ramos, supra,* 37 Cal.3d at p. 155.) Defendant had no right to present evidence or to have the jury instructed on matters the jury should not have been considering in the first place. (See *People v. Hunter, supra,* 49 Cal.3d at p. 984 ["where . . . the jury has been admonished to disregard the commutation power, such evidence would have been wholly irrelevant"].)

D. *Cumulative Error*

Defendant argues the cumulative effect of the errors in both the guilt phase and the penalty phase requires reversal of both the guilt and penalty verdicts. We disagree. We have concluded that all of defendant's claims of error are either meritless or do not require reversal. Whether we consider such claims individually or together, we find no prejudicial error at either phase of the proceedings.

E. *Constitutional Challenges to California's Death Penalty Statute*

Defendant contends the sentencing scheme under California's death penalty statute is constitutionally flawed for a number of reasons. We have repeatedly rejected identical claims, as follows.

California's death penalty statute "does not fail to perform the constitutionally required narrowing function by virtue of the number of special circumstances it provides or the manner in which they have been construed."

(*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1050 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Cook* (2006) 39 Cal.4th 566, 617 [47 Cal.Rptr.3d 22, 139 P.3d 492].) As Justice Kennard recently explained in a concurring opinion, although at one time the United States Supreme Court suggested that a constitutionally valid death penalty law must exclude most murders from eligibility for the death penalty, that is no longer the case. (*People v. Jurado* (2006) 38 Cal.4th 72, 146 [41 Cal.Rptr.3d 319, 131 P.3d 400] (conc. opn. of Kennard, J., and authorities cited therein).) Because the special circumstances listed in section 190.2 apply only to a subclass of murderers, not to all murderers (*Tuilaepa v. California* (1994) 512 U.S. 967, 971–972 [129 L.Ed.2d 750, 114 S.Ct. 2630]), there is no merit to defendant's contention, based on a statistical analysis examining appeals from murder convictions, that our death penalty law is impermissibly broad. (See *People v. Morrison, supra,* 34 Cal.4th at p. 730; *People v. Frye, supra,* 18 Cal.4th at pp. 1028–1029.)

As applied, section 190.3, factor (a), does not result in the arbitrary or capricious imposition of the death penalty. (*People v. Elliot* (2005) 37 Cal.4th 453, 487 [35 Cal.Rptr.3d 759, 122 P.3d 968]; *People v. Lewis* (2001) 26 Cal.4th 334, 394 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Jenkins, supra,* 22 Cal.4th at pp. 1050–1053.)

A penalty phase jury may consider prior unadjudicated criminal conduct under section 190.3, factor (b), and the jury need not make a unanimous finding that defendant was guilty of the unadjudicated crimes. (*People v. Elliot, supra,* 37 Cal.4th at p. 488; see *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1066, 1068 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Cook, supra,* 39 Cal.4th at pp. 618, 619.)

Section 190.3's use of adjectives such as "extreme" (factors (d), (g)) and "substantial" (factor (g)) in describing mitigating circumstances does not impermissibly limit consideration of such factors. (*People v. Elliot, supra,* 37 Cal.4th at p. 488; *People v. Morrison, supra,* 34 Cal.4th at pp. 729–730.)

The absence of procedural safeguards utilized by other states in the operation of their death penalty laws does not render California's law unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*People v. Lawley* (2002) 27 Cal.4th 102, 169 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Lucero* (2000) 23 Cal.4th 692, 741 [97 Cal.Rptr.2d 871, 3 P.3d 248].) As we have repeatedly concluded, "[t]he jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty." (*People v. Morrison,*

*supra*, 34 Cal.4th at p. 730, and cases cited; see *People v. Lucero, supra*, 23 Cal.4th at p. 741.) Neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], affects California's death penalty law or otherwise calls for a different result. (*People v. Cook, supra*, 39 Cal.4th at pp. 618–619; *People v. Morrison, supra*, 34 Cal.4th at p. 731.)

"The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination. [Citations.]" (*People v. Morrison, supra*, 34 Cal.4th at pp. 730–731; see *People v. Sapp* (2003) 31 Cal.4th 240, 316–317 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].) We therefore reject defendant's alternative contention that, at the very least, the jury is required to find by a preponderance of the evidence that an aggravating circumstance is proved, that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. (*People v. Lewis and Oliver, supra*, 39 Cal.4th at p. 1066.)

Intercase proportionality review is not constitutionally required. (*People v. Elliot, supra*, 37 Cal.4th at p. 488; *People v. Morrison, supra*, 34 Cal.4th at p. 731.) Equal protection does not require that capital defendants be afforded the same sentence review as other felons in the noncapital context. (*People v. Cook, supra*, 39 Cal.4th at p. 619; *People v. Morrison, supra*, 34 Cal.4th at p. 731.)

The trial court did not commit constitutional error by failing to instruct that statutory mitigating factors were relevant only in mitigation. (*People v. Elliot, supra*, 37 Cal.4th at p. 488; *People v. Morrison, supra*, 34 Cal.4th at p. 730.) Moreover, "the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]" (*People v. Morrison, supra*, 34 Cal.4th at p. 730.)

Finally, we have previously rejected the contention that "California's imposition of death 'as a regular form of punishment for a substantial number of crimes' falls below international norms of humanity and decency." (*People v. Cook, supra*, 39 Cal.4th at p. 619; see *People v. Harris* (2005) 37 Cal.4th 310, 366 [33 Cal.Rptr.3d 509, 118 P.3d 545].) We do so again here.

## III. DISPOSITION

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied May 9, 2007.