Filed 4/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B334490 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA151039-01) |
| v. | |
| JOHN BENSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Sean D. Coen, Judge.  Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

John Benson, convicted of the first degree murder of Chloe Evans and other felonies, appeals his convictions. Benson contends the trial court erred by admitting certain evidence, granting a continuance during trial, and failing to investigate a juror; he also claims prosecutorial error during closing argument. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Investigation and Charges

On October 25, 2019, Chloe Evans was shot to death while engaged as a commercial sex worker in Los Angeles. At first, police had little information about the shooter. However, on November 10, 2019, Kiera Furlow told Los Angeles Police Department Officer Manuel Armenta that she had been working as a sex worker nearby on the night of the shooting. Furlow told Armenta that shooter, driving a white Chevy Impala, repeatedly approached and harassed several commercial sex workers on the street over the course of two hours. Furlow said the man repeatedly said he was from the Main Street Mafia Crips and was there "on some gang bangin[g] shit." Furlow described witnessing the shooting and gave the police a physical description of the shooter, whose name she did not know.

Armenta shared this information with Michael Levant, the detective assigned to investigate the shooting, and on November 13, 2019, they consulted Los Angeles Police Department Officer Alex Zamora, who monitored the Main Street Mafia Crips and the Hoover Criminals for the Southeast Gang Enforcement Detail. Based on the physical description and gang association information given to him by Levant and Armenta, including

2

information about a tattoo with the letters M and A on the left arm, Zamora identified Benson as a potential suspect.

Levant interviewed Furlow on December 4, 2019. Furlow said the shooter had spent several hours prior to the shooting "messin[g] with the girls" on the street. One woman, known as Chocolate, entered and exited his car. Furlow listened to Chocolate and the driver talking. The man, Furlow reported, "was like, you know, do y'all know what's goin[g] on around here? He was like, I'm on some gang bangin[g] shit. It's not no ho shit goin[g] on. He was like, It's some whole other shit goin[g] on over here." He told Chocolate he was from Main Street.

Furlow told Levant the man picked Evans up, then robbed her and took her phone. Furlow told Levant she believed the man was looking for a girl associated with the Hoover gang, a Main Street enemy, because he told Chocolate he was there on some "hood business" and Evans was from Hoover. She said "word on the street" was that the shooter targeted Evans because her pimp was supposed to be from Hoover.

Evans reported to her pimp, Joshua Ellis, what had happened, and the shooting occurred when Ellis arrived on the scene. Furlow saw the shooter point a gun, and she both heard the gun fire and saw the muzzle flash. The driver of the white car began shooting first, and Ellis fired back. Furlow believed Evans was caught in the crossfire.

Furlow gave Levant a description of the driver. She said if she saw the man again, she would know "exactly who he is because [she had] seen him face to face." She was confident she would recognize him: "I would know exactly who he is because . . . I seen him too many times that night. And literally when he pulled up to the side of us, he had his window down and

3

was sitting there talkin[g] to Chocolate for a good five minutes." Furlow also told Levant she had seen the man before the night of the shooting. As soon as the man mentioned Main Street, she realized that was how she knew him. Furlow knew some gang members, including a woman known as S.K. from Main Street, and Furlow had seen the man on S.K.'s social media.

Furlow identified Benson from a photographic lineup. She was confident in her identification, saying, "For sure he was driving the car. That I—I know his face, yep," and "No if, ands, but[]s about it. It was him. He was the driver."

In a later interview, Furlow told Levant she had seen Benson previously at parties for S.K.'s children. According to Furlow, on the night of the shooting she and Benson recognized each other. She said Benson told her he remembered her "from S.K."

Benson was charged with murdering Evans (Pen. Code,[1] § 187, subd. (a)), attempting to murder Ellis (§§ 664/187, subd. (a)), shooting at an occupied motor vehicle (§246), shooting from a motor vehicle (§ 26100, subd. (c)), and possession of firearms by a felon (§ 29800, subd. (a)(1)). Gun use and gang enhancement allegations were charged as to the first four offenses, and a prior strike offense was alleged.

B.    First Trial

Benson had two jury trials. In 2022, during Benson's first trial, Furlow identified Benson in court as the shooter. The trial court allowed Furlow to testify Benson had told her before the

---

[1]    Unless otherwise indicated, all statutory references are to the Penal Code.

4

shooting, "I'm here on some gang shit." Benson's first trial ended in a mistrial with a hung jury.

C.      Second Trial

Furlow was so reluctant to testify at the second trial that she had to be arrested to secure her appearance. The prosecutor asked the court for permission to question Furlow about how she knew Benson, his gang ties, her fear of testifying, and the fact that she had to be arrested in order to compel her testimony. The court declined to change its prior rulings on gang evidence, but said, "It can be asked of [Furlow] that she did not want to come to court and that she had to be arrested to come to court, but we will not elaborate into any gang evidence." The court said Furlow could testify "[i]t was a Main Street Mafia gathering and that's all and it's not an elaboration in regards to that being a gang, what it is."

During her opening statement, the prosecutor told the jury Benson said, " 'I'm not here for the girls. I'm here on some gang shit.' And [Furlow] recognized him because she had seen him before. [¶] She had seen him before at a gang type event and that's what caused her to recognize him when he said that."

On direct examination, Furlow was uncooperative, recanted the vast majority of her prior statements, and repeatedly claimed she did not want to testify because she was scared of the police, whom she accused of forcing her to lie. The prosecutor asked Furlow if she had told the police during her December 2019 interview that before the shooting, Benson had said, " 'We're over here on some gang banging shit. We're not on no, you know, not on no hoe shit. We're on some gang banging shit." Furlow said she did not remember. She was not sure if she was questioned about this when she previously testified, saying, "I know that I

was coached and I know that I was forced to say stuff, so I don't remember a lot." When the prosecutor read her prior testimony that Benson said he was there "for some gang shit" and that Furlow recognized him, Furlow acknowledged this was her prior testimony.

Furlow denied telling the police in December 2019 that she had recognized Benson. When asked if she said she remembered him because she had seen him at a barbecue with some people from Main Street, Furlow responded, "No, that's incorrect." Furlow claimed not to recognize Benson, and when asked to confirm she had previously identified Benson in court, Furlow responded, "Because you guys—yes, the police department. Yes, my safety and everything is at risk. My life, my children, everything is at risk because of what you guys did and what you guys are trying to make me do." Furlow testified she was being forced by "you guys" to be there, and she was scared. Furlow said she feared for her safety and had been traumatized by being taken into custody to secure her testimony. She alleged the prosecution had threatened her.

On cross-examination, defense counsel delved deeply into Furlow's fears, gang issues, and Furlow's accusations against the police and prosecution. When asked what she was afraid of, Furlow said she had been harassed by detectives, and then said, "As well as the safety. Like I said, that they—the—as far as gangs, everything, everything. As far as gangs."

Defense counsel asked, "Are you afraid of Main Street?"

Furlow answered, "As far as this case, yes." Defense counsel asked Furlow why, and she said, "Because of the situation. This is not something light. This is a murder charge."

6

"And does that fear have anything to do with Mr. Benson, my client?" asked defense counsel.

Furlow responded, "As far as—I'm not sure if, you know, he's, like, you know—Main Street as far as the gang, I mean, yes. As far as him, I'm not sure what he's capable of, you know. I don't know—I don't know anything about him." She continued, "I'm just saying as far as Main Street. I'm not saying that he has anything to do with it. I'm talking about the gang." In response to defense counsel's questioning, Furlow testified she was not concerned for her safety from any other gang.

Defense counsel asked Furlow whether, from the time she first spoke with police to the present day, "has anyone from Main Street done anything to you?" Furlow responded in the negative. Defense counsel then asked, "Is it true, then, that the only person or entity that has done anything to cause you stress has been law enforcement?"

"Correct," answered Furlow.

After cross-examination, the prosecutor argued the defense had opened the door to all gang evidence by questioning Furlow about gangs and Main Street. The prosecutor contended statements Furlow made to the police at the start of the investigation about her views of Main Street, how they were looking for women associated with the Hoover gang, and that Evans was targeted were all now relevant. As Furlow previously had been clear that she was afraid of Benson but now claimed fear of the police, the prosecutor wanted to explore that "really she's afraid of the defendant and we now need to know why." She argued Benson's repeated identifications of himself as from Main Street and Furlow's understanding of why Benson was there that

night were relevant to why she was now uncooperative and recanting.

Over defense objection, the court authorized the prosecutor to ask Furlow why she was afraid of Main Street and what she had heard the night of the shooting about the gang and hunting Hoover women. The court ruled evidence Furlow was afraid of Main Street and what happened that night "specifically can come in because it is quite inconsistent with what she has said on the stand now that in regards to why she is afraid and that she was—solely her fear is from police harassment."

On redirect examination, Furlow denied telling Levant she did not want to testify because she knew Benson would recognize her. She denied telling the police in November 2019 that she had seen the shooter and knew he was from Main Street. She denied voluntarily speaking with Levant in December 2019. Furlow claimed she was handcuffed and forced to go to the police station, where she was held for an hour. She denied identifying a photograph of Benson as the driver of the car.

Furlow denied telling the police in November and December 2019 that the "talk" about what happened the night Evans died was that Benson was from Main Street. She denied telling the police in November 2019 that the driver of the car was from Main Street. She also denied reporting to the police that Benson recognized her because he had seen her before at a mutual friend's party attended by Main Street gangsters. She denied telling the police Benson had said he was not there to pick up women but to target women affiliated with the Hoover gang.

In a series of questions, the prosecutor asked Furlow whether it was true she had shared this information with the police, she believed it still, and she was recanting out of fear.

Furlow said all this was incorrect and "[t]he police is who I'm really scared of." She denied telling Levant when she was arrested the week before the retrial that she was afraid for her family and for herself, and she would not be "as afraid" if he were "just a regular guy." She admitted being afraid for her mother and for her sister who resembled her, but denied she was afraid of Benson because she believed him to be part of a gang. Furlow said the police had forced her, trained her, and coerced her to say certain things, they were harassing her, and she was not scared of anyone other than the police.

Recordings of Furlow's interviews were played for the jury. Additionally, Levant testified he had temporarily relocated Furlow and her family because, in addition to Furlow and Benson having a mutual friend associated with Main Street, Furlow had told him Benson recognized her and knew where she lived, and her twin sister and mother were in fear based on the location of their home. He testified Furlow had expressed fear for her safety.

Also at the second trial, the prosecutor sought to introduce the description of Benson's tattoo and evidence that police officers who were experts on Main Street identified Benson as a possible suspect based on the description of the shooter and his tattoo. Defense counsel argued that all the jury needed to know was that based on information from a witness, the police took particular actions. The court thought this would confuse the jury, but offered to give a limiting instruction that the testimony was not being offered for its truth but for its effect on the listeners. Defense counsel asked for the limiting instruction.

The court found admissible the evidence that the investigating officers consulted officers who specialized in gangs,

9

"[a]nd because they work Main Street Mafia, they think they know the individual, not that he's from Main Street Mafia, et cetera, then they put together this six-pack with that particular tattoo and that's how it came up with the person." The court specifically precluded the prosecutor from eliciting testimony from the gang officers that they knew Benson was a documented gang member. However, the officers could testify about their expertise, in "that they work the Main Street Mafia Crips gang, et cetera, whatever, but without saying this individual is a Main Street Mafia Crip or any acknowledgment of that, but they're familiar with this particular tattoo and that's it and this individual."

Zamora, the officer who had identified Benson as a possible suspect, testified he had been assigned to a gang enforcement detail and monitored both the Main Street Mafia Crips and the Hoover Criminals. He testified Levant and Armenta gave him the following description of a possible suspect: a stocky Black man in his late 20's or early 30's, with short hair and salt-and-pepper facial hair, who wore earrings and had an "M.A. tattoo on the left arm." Based on this information, Zamora identified Benson as a suspect. Zamora testified he located Benson, confirmed Benson matched the physical description Zamora had been given, and "verif[ied] that [Benson] had a tattoo on his left forearm that said, 'Mafia IV Life.' And the IV was in Roman numerals." The tattoo contained an "M" and an "A."

Benson was acquitted of the attempted murder of Ellis but convicted of first degree murder, shooting at an occupied motor vehicle, shooting from a motor vehicle, and possession of a firearm by a felon. Benson was sentenced to 120 years to life in state prison. He appeals.

# DISCUSSION

## I.   *Evidence Pertaining to Gangs*

"Only relevant evidence is admissible.  (Evid. Code, § 350.)
Evidence is relevant if it has a 'tendency in reason to prove or
disprove any disputed fact that is of consequence to the
determination of the action.'  (*Id.*, § 210.)"  (*People v. Helzer*
(2024) 15 Cal.5th 622, 667.)  This includes evidence relevant to
the credibility of a witness.  (Evid. Code, § 210; *People v. Abel*
(2012) 53 Cal.4th 891, 924.)  "Although evidence of gang
membership carries the potential for prejudice, it ' "is often
relevant to, and admissible regarding, the charged offense.
Evidence of the defendant's gang affiliation—including evidence
of the gang's territory, membership, signs, symbols, beliefs and
practices, criminal enterprises, rivalries, and the like—can help
prove identity, motive, modus operandi, specific intent, means of
applying force or fear, or other issues pertinent to guilt of the
charged crime." ' "  (*People v. Holmes, McClain and Newborn*
(2022) 12 Cal.5th 719, 772.)  " 'The trial court has broad
discretion to determine the relevance of evidence [citation], and
we will not disturb the court's exercise of that discretion unless it
acted in an arbitrary, capricious or patently absurd manner.' "
(*Helzer*, at p. 667.)

Although in the opening brief Benson sets forth all or
nearly all the references to gangs at trial, and he generally
asserts it all was erroneously admitted because it was irrelevant,
his legal argument concerns four specific pieces of evidence he
claims to have been irrelevant:[2]  Benson's statement before the

---

[2]     To any extent Benson intends to challenge other references
to gangs by conclusorily mentioning, for example, allegedly

11

shooting, "I'm here on some gang shit"; the identification of the prior events from which Furlow recognized Benson as gang-related events; the description of the police officer who identified Benson as a suspect as an officer who monitored Main Street; and the description of Benson's tattoo as stating "Mafia IV Life."  We

---

prejudicial evidence of "the rivalry between his gang and the Hoover gang, and the danger that gangs present to witnesses like" Furlow, Benson has failed to present an adequate argument for review concerning these alleged errors.  " '[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' [Citation.]  'We are not obliged to make other arguments for [appellant] [citation], nor are we obliged to speculate about which issues counsel intend to raise.' " (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)  It is difficult to know exactly what evidence about gang dangerousness Benson refers to.  This is so because he provides no citations to the record to support this statement.  We note that the evidence about Furlow's fear of gangs in general was largely elicited by defense counsel on cross-examination.  Moreover, Benson fails to acknowledge that the evidence about Benson hunting for Hoover members and the degree to which Furlow had expressed fear of Benson was only ruled admissible because of Furlow's inconsistent testimony and Benson opening the door on cross-examination.  When a trial court clearly relies on a stated rationale for its ruling, the party challenging that ruling fails to rebut the presumption of correctness if it does not make some effort to address the court's rationale on appeal.  (See *ibid.* [appellant bears the burden of affirmatively demonstrating error, and the trial court's order is presumed to be correct on appeal]; 9 Witkin, Cal. Procedure (6th ed. 2025) Appeal, § 375 ["[E]rror must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error."].)

conclude the trial court did not abuse its discretion by admitting this evidence, as it was relevant to issues of identity, witness credibility, and motive.

Although Benson claims the issue at the second trial was whether he fired in self-defense, the record shows Benson also contested the element of identity. During her opening statement, defense counsel referred to "Benson or whoever was in that white car, whoever you believe was in the white car," and she told the jury, "I am confident, ladies and gentlemen, at the end of this case, you will not be able to conclude beyond a reasonable doubt that Mr. Benson had any other choice but—if it was him, that he had no other choice but to return fire." In closing argument, defense counsel questioned whether Benson was the person in the white car, stating, "[W]as Mr. Benson in that car? I don't think there's sufficient evidence to say he was."

Benson's statement to Furlow before the shooting that he was from Main Street and was there on gang business rather than to hire a commercial sex worker supplies a motive for the shooting and explains why Benson had been hanging around the area for hours rather than engaging in a transaction and then departing. Additionally, Benson's identification of his gang and his purpose bore on the question of identity because they prompted Furlow to recognize him. Given that Furlow's interaction with Benson on the night of the shooting had been brief, this explanation of how Furlow recognized him allowed the jury to assess both the accuracy of her identification of Benson as the shooter and her credibility as a witness. Finally, this evidence was highly relevant to Furlow's overall credibility because her intense and extreme fear of Benson and his Main Street associates provided an explanation for her near-total

13

recantation of her prior testimony and statements. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

The evidence of Benson's tattoo was also relevant to the issue of identity. The fact that Benson's tattoo matched a witness's description of the shooter's tattoo tended to establish his identity as the shooter. We cannot say it was arbitrary, capricious or patently absurd for the trial court to conclude the specific text of the tattoo was relevant to the identity of the shooter when a partial description of the shooter's tattoo had been provided.

Additionally, the expertise of Zamora, the officer who initially followed up on the evidence of the tattoo and physical description, was central to the investigative process of identifying Benson as the shooter and bore upon the credibility of the evidence of identity. Witnesses' physical descriptions of Benson, including a description of his tattoo, combined with information that the shooter was from Main Street, allowed Zamora, who monitored Main Street, to identify Benson by name as a possible suspect. Levant had this knowledge when he prepared the photographic lineup from which Furlow identified Benson as the person who shot Evans. We cannot say the trial court abused its discretion when it concluded a complete sanitization of how the police came to identify Benson as a suspect would confuse the jury. The jury had already learned Benson said he was from Main Street because this was otherwise relevant, as discussed above; learning the officer who pinpointed him as the suspect was consulted because of his familiarity with Main Street gave context and explained how the investigation proceeded while not

14

providing any new information to the jury. Benson argues the evidence was unnecessary because the police knew Benson's name "as early as [Furlow's] six-pack identification," but it was not Furlow's identification from a photographic lineup that gave the police Benson's name; rather, it was Zamora's identification of Benson (based on physical description and gang affiliation) that led to the preparation of the photographic lineup from which Furlow then identified Benson.

## II.    *Continuance*

During trial, and over defense objection, the trial court granted a one-week continuance due to the out-of-state death of a member of the prosecutor's family. We review the decision to grant a continuance for abuse of discretion. (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

Section 1050 is a directory statute governing continuances in criminal matters. Under this section, a party seeking a continuance must file and serve notice of its motion at least two court days before the hearing to be continued, together with affidavits or declarations detailing specific facts showing a continuance is necessary. (§ 1050, subd. (b).) A party may move for a continuance without following this procedure (*id.*, subd. (c)), and in that case, "the court shall hold a hearing on whether there is good cause for the failure to comply with those requirements." (*Id.*, subd. (d).) If the moving party is unable to show good cause for the failure to give notice, the motion for continuance shall not be granted. (*Ibid.*) If the moving party shows good cause for failing to request a continuance using the procedure in section 1050, subdivision (a), then the court considers whether the party has demonstrated good cause for the requested continuance. (§ 1050, subds. (e), (f).) If the court finds good cause, it "shall

15

state on the record the facts proved that justify its finding," and a statement of the facts proved shall be entered in the minutes. (*Id.*, subd. (f).)

Benson does not allege the continuance was not supported by good cause. Rather, he claims the prosecutor should have filed a written motion at least two court days before the scheduled hearing, and he faults the trial court for not holding a hearing and making findings on the record. Benson forfeited these procedural objections when he did not object to the absence of a written motion, ask for a hearing, or request findings be made on the record in the trial court, when the court could have corrected any error in this regard. (See *People v. Dudley* (1967) 250 Cal.App.2d Supp. 955, 960 ["defendant never objected in the trial court to the failure to record the reasons for the continuance in the minutes. He cannot raise this question for the first time on appeal"], disapproved on another ground in *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 257, fn. 13; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468–1469 [interests of fairness to the sentencing court, fairness to the opposing party, and the needs for an orderly and efficient administration of law and judicial economy require a defendant to make a timely objection in the trial court to preserve an issue for appeal].) Moreover, section 1050 authorizes unwritten motions for continuances, and it is directory only. (§ 1050, subds. (c), (l); *People v. Brown* (2023) 14 Cal.5th 530, 538.)

Benson claims the absence of a hearing "supports the inference" that the trial court did not properly weigh the factors involved in deciding whether to grant a continuance, and the absence of findings on the record "supports an inference" that the court granted the prosecutor's request for a continuance without

16

inquiring into the possibility of an alternative solution protecting his interests.  We do not assume the trial court erred.  "[I]t is a fundamental principle of appellate procedure that a trial court [order or] judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)  Benson has not demonstrated any error or abuse of discretion.

Benson compares his case to *People v. Santamaria* (1991) 229 Cal.App.3d 269, *People v. Dinsmore* (1894) 102 Cal. 381 (*Dinsmore*), and *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14 (*Engleman*), abrogated on other grounds as stated in *People v. Wolterman* (1992) 11 Cal.App.4th Supp. 15, 20, each of which found error from a trial continuance.  Each of those cases is distinguishable from the circumstances presented here.  In contrast to *Santamaria*, where the court imposed an "unwarranted" 11-day continuance during jury deliberations for the court's convenience (*Santamaria*, at pp. 272, 277, 281), the reason for the continuance here was significantly more compelling—the death of a member of the prosecutor's family and funeral services in another state.  The impact of the continuance here was also of lesser magnitude.  In *Santamaria*, the Court of Appeal emphasized the continuance came "at the most critical period in the trial," jury deliberations, when all the evidence and argument had already concluded.  (*Id*. at p. 281.)  The *Santamaria* court noted the impact of the continuance would not have been as great if the continuance had taken place mid-trial because counsel's closing argument might have minimized or countered the effect of the delay on jurors' recall.  (*Id*. at p. 282.)

17

Here, the continuance did take place in the middle of the trial, and the jury received additional evidence and heard instructions and closing argument after the continuance. *Santamaria* does not aid appellant here.

In *Dinsmore*, the trial court granted a 63-day continuance during trial due to a witness's illness. (*Dinsmore*, *supra*, 102 Cal. at pp. 382–383.) One week does not remotely compare to nine weeks. In *Engleman*, the court ordered a three-week trial continuance after the People had rested but before the defense had the opportunity to present its case. (*Engleman*, *supra*, 116 Cal.App.3d Supp. at pp. 20–21.) In that case the reason for the continuance was, again, the court's schedule, and the problematic impact of the continuance was that it left the jury having heard the full People's case but no defense—a one-sided presentation of the case that the reviewing court believed caused the jury to determine the case before hearing both sides. (*Id*. at p. 21.) Here, the continuance was one-third as long as that in *Engleman*, the basis for the continuance was more significant than court scheduling, and its impact was lessened by the fact that the People were still in the process of presenting evidence. The jury was not left for weeks with the one-sided presentation of the case. Neither *Dinsmore* nor *Engleman* establishes an abuse of discretion here.

As Benson acknowledges, the impact of the continuance was that the case took 18 days rather than 13 days to reach the jury. Benson has not demonstrated the continuance so disrupted the trial that it undermined his state and federal due process rights to a fair trial.

### III.  *Juror Investigation*

At the beginning of voir dire, the trial court asked the potential jurors in the courtroom whether they recognized the defendant, the judge, either attorney, courtroom staff, or any of the potential witnesses.  No potential juror raised their hand.

Juror No. 1 was selected for the jury.  After the jury was sworn and seated, but before opening statements, defense counsel asked the trial court to either investigate Juror No. 1's possible bias or to dismiss him.  The basis for this request was a conversation between the juror and the court that is not included in the record on appeal, but was described by defense counsel as follows: The juror said he believed he recognized Benson, but he could not tell the court how he recognized Benson, from what source he recognized Benson, or from where he recognized Benson.  Apparently the court reseated Juror No. 1 without explaining its thought processes, as defense counsel continued, "[I]t's my impression that the court either didn't find it relevant or felt that maybe he was just trying to get out of jury duty, I don't know which—."

"You're absolutely correct," the court interjected.

Defense counsel expressed concern the issue was not fully explored and requested the court either dismiss Juror No. 1 or ask him if he could be fair and impartial since he believed he had previously seen Benson.  The court denied defense counsel's request, stating its decision was "based on his answers, the fact that came up after he became a sworn juror."

Later, after the jury reached its verdicts, Benson moved for a new trial, identifying as one basis for the motion the court's refusal to excuse Juror No. 1.  The court denied the motion,

19

stating, "[T]hat juror was interviewed and the court was satisfied with the answers the juror gave that the juror could be fair."

Section 1089 provides that the court may replace a juror with an alternate juror upon "good cause shown to the court" that the juror is "unable to perform his or her duty." In construing this statute, the California Supreme Court has held that " ' "[o]nce a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 941 (*Martinez*).) However, " 'not every incident involving a juror's conduct requires or warrants further investigation. "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court." ' [Citation.] ' "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." ' " (*Id.* at p. 942.)

Benson argues the trial court's refusal to make further inquiry of the juror was an abuse of discretion because "[r]ather than fairly assessing the record of Juror No. 1's voir dire and making the inquiry that [defense counsel] requested, the trial court, relying on its own bias against jurors who raise concerns after being sworn, concluded, without substantial evidence, that Juror No. 1 was being dishonest." Without a record of what the judge asked the juror and the juror told the judge, however, we cannot ascertain whether the court possessed information which, if proven to be true, would constitute good cause to doubt Juror

No. 1's ability to perform his duties and would justify his removal from the case, nor can we determine what inquiry was reasonably necessary to determine whether the juror should be discharged, whether the court satisfied that duty, and whether refusing to further question the juror was an abuse of discretion. (See *Martinez*, *supra*, 47 Cal.4th at pp. 941–942.) The appellant bears the burden of providing an adequate record affirmatively demonstrating error, and when an appellant fails to supply a record adequate to review a claim, the claim fails. (*People v. Whalen* (2013) 56 Cal.4th 1, 85, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.)

IV.  ***Prosecutorial Error***

During closing, the prosecutor's arguments about willful, premeditated, and deliberate murder included analogies to deciding whether to swing at a pitch in baseball and deciding whether to proceed through an intersection when the traffic light is changing. Benson contends these analogies and arguments misled the jury about the distinction between first and second degree murder, as well as about the extent of the reflection required for first versus second degree murder.

Benson did not object on these grounds at trial, and he does not contend on appeal that an objection and/or request for admonition would have been futile or an admonition would have been insufficient to cure the harm. "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.] A defendant will be excused from the requirement of making a timely objection and/or a request for admonition if either would have been futile. [Citation.] In addition, the failure to request

21

that the jury be admonished does not forfeit the issue for appeal if an admonition would not have cured the harm caused by the misconduct or the trial court immediately overrules an objection to alleged misconduct such that the defendant has no opportunity to make such a request." (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) Benson points out appellate courts have discretion to consider issues even if they have not been preserved and some constitutional issues may be raised on appeal even when not preserved at trial; however, he has not demonstrated any reason for this court to deviate from the well-established standard for preserving prosecutorial error claims for appeal. Benson has forfeited this claim.

## DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.