Filed 4/1/26  P. v. Silva CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084874 |
| v. | (Super.Ct.No. SWF1302573) |
| EDGAR SILVA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed with directions.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Robin Urbanski, Kristen Ramirez and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant and appellant appeals following his resentencing hearing. On appeal, defendant insists the trial court erred in denying his motion to continue the resentencing hearing so that he could investigate potential claims under the California Racial Justice Act of 2020 (RJA) (Racial Justice Act; Pen. Code,[1] §§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)). He also asserts that the abstract of judgment should be modified to reflect the trial court had suspended the victim restitution fines at the time of the resentencing hearing. We agree with the parties that the abstract of judgment must be corrected to accurately reflect the trial court's oral pronouncement. We, however, find no error in the trial court's denial of defendant's continuance request.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*[2]

Defendant beat Shirley Corrales, his girlfriend, to death in a "'sadistic and savage'" manner. Corrales began dating defendant in July 2012, when she was 19 years old. In June 2013, just after Corrales turned 20 years old, she moved into defendant's house in Temecula, California. She died on August 16, 2013. (*Silva*, *supra*, E064416.)

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

[2] The factual background is taken from this court's unpublished opinion from defendant's direct appeal in case No. E064416. (*People v. Silva* (June 27, 2017, E064416) [nonpub. opn.] (*Silva*).)

On the day Corrales died, defendant's neighbor heard someone yelling, which woke her at around 7:30 or 8:00 a.m. on August 16. Specifically, she heard an angry male voice yelling, " 'You F'ing cunt, I'm going to F'ing kill you. Why would you do that? You're F'ing dead. I'm going to F'ing kill you.' " She thought the yelling was directed at a woman because the male used the words " 'bitch' " and " 'cunt.' " The neighbor's boyfriend also heard someone yelling, " 'I'm going to kill you.' " The yelling continued for close to an hour. The neighbor could still hear the yelling even after her boyfriend shut the sliding door. (*Silva, supra*, E064416.)

Defendant's friend Mathis R. went to defendant's house a few hours after 9:00 a.m. on August 16, 2013. When he arrived with three friends, including Shannon P., Mathis knocked loudly on defendant's front door, but no one answered. He hopped the fence to the backyard and went to the sliding glass door leading to the master bedroom. The door was cracked open approximately six inches, and Mathis could see defendant and Corrales on the bed. Mathis spoke through the door and told defendant to get up. Defendant asked him to go through another sliding glass door leading to the kitchen. Mathis found that door locked and went back to the master bedroom door, where he entered the house. (*Silva, supra*, E064416.)

Corrales was lying on the bed on her stomach. She was wearing only boxer shorts and a tank top. At a glance, she appeared to be covered all over in hair dye, but Mathis soon realized she was covered in bruises. She was not moving. Mathis asked defendant what had happened, and defendant said, " 'I messed up, I messed up,' " several times.

Defendant said he had "hit her with some cords." Mathis saw "electrical cords from appliances or something" in the room. He put his ear close to Corrales's mouth and heard short, shallow breaths. He told defendant they could not leave Corrales like that and had to do something. (*Silva*, *supra*, E064416.)

By this time, defendant's roommate Giselle B. had returned to the house and entered the room through the bedroom door. She saw defendant and Corrales lying on the bed when she entered. Corrales was not moving on the bed but appeared to be breathing. Her legs appeared to have purple hair dye on them. (*Silva*, *supra*, E064416.)

Mathis said he was going to "get rid of" the people in his car and then return to defendant's house. He drove two of his friends to a nearby location and returned to defendant's house with Shannon. In the meantime, Giselle had realized "something was wrong with" Corrales. She told defendant, "something's not right," and asked him to "do something." He was frantic and tried to do cardiopulmonary resuscitation on Corrales, and when that did not work, he moved her to a sitting position on the couch in the master bedroom. Water came out of her mouth when he moved her. He told Giselle to call 911. (*Silva*, *supra*, E064416.)

When Mathis and Shannon returned, Giselle and her kids were getting into their car, and Giselle told them to call 911. Corrales was no longer breathing. Shannon called 911 from her telephone. Mathis went into the house with defendant, where Corrales was on the couch in the master bedroom. Mathis grabbed the telephone from Shannon and gave the dispatcher the address, and the dispatcher walked him through performing chest

4

compressions on Corrales. He was still doing them three to four minutes later when the police arrived. Before the police arrived, Mathis told defendant to leave, and defendant fled out the door to the backyard. (*Silva*, *supra*, E064416.)

The responding officer (with 13 years' experience) and paramedic (with 20 years' experience) had never seen bruising as extensive as Corrales's bruising. The paramedic pronounced Corrales dead at the scene. (*Silva*, *supra*, E064416.)

Investigating officers from the Riverside County Sheriff's Department (one with 15 years' experience and the other with 13 years' experience) also noted they had never seen bruising as extensive as Corrales's injuries. Corrales had a vein in the bend of her right arm that appeared to be "blown out," or used extensively for drug use. (*Silva*, *supra*, E064416.)

Some of the marks on Corrales's body looked as though they were the result of being struck by a cord. In the closet, an investigator found a piece of white plastic pipe with cables wrapped around it and secured with clear tape. Other loose cables were on the floor. The investigator found clear tape elsewhere in the room that appeared to match the tape on the cables. Another piece of white plastic pipe was under the bed, and a broken wooden handle of some sort was also in the room. It appeared to the investigator that Corrales's injuries might have been inflicted with these items—that is, by whipping her with the cables wrapped around the pipe, and by striking her with the other piece of pipe and wooden handle. (*Silva*, *supra*, E064416.)

There were also three cellular telephones in the master bedroom, including a white iPhone belonging to Corrales. The white iPhone contained a video recorded on August 16, 2013, at approximately 11:00 a.m. It depicted defendant and Corrales. Corrales was crying and saying, "[N]o babe, baby, baby please, please." Defendant responded, "I got to," and "You gonna go? You gonna go? You know I'm going to babe." The video ended on Corrales saying, "No, no, please, you don't have to." (*Silva*, *supra*, E064416.)

The deputy coroner who responded to the scene did not find any signs of a drug overdose or recent puncture marks of the type caused by a syringe. Corrales had bruising on her arms, hand, thighs, hips, shins, face, breast, chest, shoulders, abdomen, buttocks, and most of her back. She also had abrasions on her chin, temple, abdomen, breast, arms, and legs, and a bump on the back of her head. Some of the bruising looked like the markings of a cord. Corrales's bruising was not consistent with lividity, or the gravitational pooling of blood that occurs after death, when a person's heart stops pumping blood. In her eight-year career, the coroner had never seen bruising as extensive as Corrales's bruising. (*Silva*, *supra*, E064416.)

On August 17, 2013, the police apprehended defendant after his next-door neighbor discovered him hiding in the neighbor's covered Jacuzzi, which had an inch or so of water in it. A detective with the Riverside County Sheriff's Department interviewed defendant. Defendant admitted he gave Corrales the bruises on her body by whipping her "with the string," or the "RCA" cord for the DVD player, and hitting her with the wooden

stick.  He used a "regular" cord, the pipe with the cord wrapped around it, and the wooden stick.  He hit her multiple times with the stick, but could not recall exactly how many, and seven to eight times with the improvised whip.  He "hit her hard" and "gave her an ass spanking."  She tried to cover herself and curled up, and told him, " 'Stop, it hurts.' "  He was angry with Corrales because she broke his iPhone, he wanted her to delete some photographs from her telephone, and she "never backed him up or talked good about him."  He was "full of rage" and could not stop himself from hitting her.  All of this occurred in the master bedroom when no one was in the house.  (*Silva*, *supra*, E064416.)

The forensic pathologist who conducted Corrales's autopsy observed bruises and abrasions all over Corrales's body.  Like the other investigators or first responders in this case, the doctor had never seen such extensive bruising, after having conducted over 4,000 autopsies.  Bruises, or contusions, involve the breaking of small vessels in the skin and underlying tissue, while abrasions are "scraping-type injuries to the surface of the skin."  The doctor noted 15 bruises or abrasions on Corrales's head, neck, and face.  She had hemorrhaging in the tissue between the scalp and skin and in the muscle that connects the head to the neck.  The doctor noted at least 36 injuries on the torso (the chest, abdomen, and back).  There were some areas of "discrete pattern injuries," which were parallel lines of bruising.  The pattern was consistent with a flexible cylindrical object such as a cord.  There were at least two dozen cord marks on her back.  The cord-mark injuries also appeared on her legs.  The cord marks, bruises, and abrasions

7

"flow[ed] together" on some areas of her body.  The bruises were caused by some sort of blunt impact, such as a punch, kick, or object striking the body.  Corrales also suffered at least 60 separate injuries on her arms, hands, and legs, some of which were consistent with defensive wounds.  (*Silva*, *supra*, E064416.)

All told, Corrales suffered over 100 separate impacts or injuries.  All of these injuries were inflicted before her death, probably within a few hours of death, and were inflicted at around the same time.  The doctor opined multiple blunt impact injuries caused Corrales's death.  This was not a typical case in that he could not pinpoint the cause of death to a single gunshot or stab wound.  (*Silva*, *supra*, E064416.)

Three of defendant's ex-girlfriends testified about his prior acts of domestic violence against them.  Defendant physically abused them by hitting them, kicking them, punching them, dragging them by the hair, and shoving a wooden stick down one victim's throat.  (*Silva*, *supra*, E064416.)

B.  *Procedural Background*

In 2014, an information was filed charging defendant with deliberate and premeditated murder (§ 187, subd. (a)).  The information further alleged that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)) and that defendant personally used two deadly weapons, to wit, a whip and a stick (§ 12022, subd. (b)(1)).  The information also alleged that defendant had served a prior prison term for spousal abuse (§ 667.5, subd. (b)).

8

In 2015, a jury convicted defendant of first degree murder and found true the torture-murder special circumstance allegation and the two deadly weapon allegations. Defendant admitted the prior prison allegation. The trial court sentenced defendant to life in prison without the possibility of parole plus a consecutive two-year term for the deadly weapon enhancements and a consecutive one-year term for the prior prison term enhancement.

On June 27, 2017, this court affirmed defendant's judgment. (*Silva*, *supra*, E064416.)

On December 7, 2023, the trial court recalled defendant's sentence pursuant to section 1172.75 and struck the prison prior as legally invalid and sentenced defendant to a total determinate term of two years plus an indeterminate term of life without parole. At that time, defendant was represented by Deputy Public Defender Joseph Martinez. The matter was set for further resentencing on May 20, 2024. On May 20, 2024, the court granted the parties' stipulated motion to continue the hearing to October 18, 2024.

On October 18, 2024, at the full resentencing hearing, defendant was represented by Deputy Public Defender Nick Kross. Defense counsel indicated that he "just got the case," and he requested a continuance to "look[ ] into the Racial Justice Act on this case." Defense counsel argued that under section 1172.75, the court was required to "evaluate the case and apply all laws that reduce sentences and allow for discretion," and citing *People v. Garcia* (2022) 85 Cal.App.5th 290 (*Garcia*), he claimed that "there is good cause to continue the case for RJA."

9

The trial court explained that "the only thing at issue is what's currently before this Court," which was "whether or not to resentence on those two one-year [deadly weapon enhancements]." The court also stated, because the prosecutor was willing to stipulate to resentencing by striking the two enhancements, "we would be done." The court noted that "[i]t was at sidebar for the first time only that [defense counsel] raised the issue that he wants this case to remain active on this Court's calendar so he can pursue discovery for a potential—not an active, but a potential petition under the Racial Justice Act[.]" Citing *In re Montgomery* (2024) 104 Cal.App.5th 1062 (*Montgomery*),[3] the court stated that "the RJA does not authorize a freestanding motion for discovery" but rather "only authorizes discovery in a pending proceeding in which the defendant has alleged—not may, not thinking about, but has alleged a violation of Section 745(a)." The court then asserted that it would take a brief recess to read *Garcia* and "see if there's something in there that persuades me that [defense counsel] would be entitled to a continuance apart from the fact that the only issue before this Court today is going to be gone in about two seconds when I strike those two enhancements."

Defense counsel disagreed "with the Court on that there is no other issue beyond the two enhancements" because the RJA provides a remedy to strike the special circumstances, "so that would be the goal if there is an RJA issue here." Defense counsel also stated that section 1172.75, subdivision (d)(2), "says the court shall apply all laws

---

[3] The Supreme Court had granted review of *Montgomery* on December 11, 2024, S287339. However, on December 30, 2025, the Supreme Court dismissed the matter without prejudice to any new motion under section 745, subdivision (d). (See *Montgomery on H.C.* (2025) 580 P.3d 1078.)

10

that reduce sentences" and "RJA is one of those laws." When the court pointed out that defense counsel had not yet filed a petition under the RJA, he responded that he "just got the case" and he "need[s] to get discovery." Defense counsel stated that he was "pursuing potentially" a claim under section 745, subdivision (a)(3), or (4), which prohibits disparate charging or sentencing based on race. He continued: "[F]or me to establish some claim on that, I have to go get data statistically of disparities, but I also have to get information about similarly situated [individuals] with similar conduct. So it does take a—it does take getting those things through discovery to then investigate if there is a claim."

After a brief recess, the trial court indicated that it had read *Garcia*. The court first proceeded with the resentencing hearing pursuant to section 1172.75, and based on the parties' stipulation, stayed the punishment for the two-year terms on the deadly weapon enhancements pursuant to section 654 then resentenced defendant to a total indeterminate term of life without parole. Defense counsel also asked the court to strike any restitution or court fees and fines. The court affirmed "any restitution order that was previously entered" but "suspend[ed] any victim restitution fines due to inability to pay[.]"

The court then turned to defense counsel's request to continue the matter to pursue discovery under the RJA. The court explained that it "has authority and jurisdiction to resolve and rule upon issues and controversy that are properly before it. I just did that. There is no issue, controversy, or petition or open case that is left for this Court to rule on regarding [defendant]." The court noted that defense counsel's "request is to continue the

11

hearing to pursue a freestanding discovery motion under the Racial Justice Act." The court explained that *Garcia* "had a little different context" and that *Montgomery*, which was decided subsequently, stood "for the proposition there is no right to a freestanding discovery motion absent a petition or habeas petition under the RJA." The court also pointed out that defendant's "pursuit of relief under [the] RJA has not ended simply because [it] didn't grant a continuance on a different issue for him to seek it." The court then denied defense counsel's request for a continuance, noting counsel had "all remedies available, appellate or otherwise, based on my ruling."

Defense counsel responded by stating *Montgomery* was distinguishable because defendant's judgment was vacated, and he was "back here on a nonfinal case pending sentencing," while the defendant in *Montgomery* "was seeking relief for RJA in a freestanding RJA motion" in a final case. He also asserted that pursuant to the section 1172.75 resentencing hearing, the trial court was required to apply all new laws that reduce sentences, including the RJA. Accordingly, he argued that *Garcia* was analogous and that defendant was entitled to "bring in a motion for RJA discovery."

The court replied that it did not "believe the RJA is self-executing when there's an open case." The court explained: "It's just not. Statute is pretty clear. There has to be a petition filed alleging the violation and then the process unfolds where the Court would make a prima facie finding and then move forward. So it's no[t] self-executing. If that's the case, then every single criminal defendant who's convicted of any crime that goes to sentencing would have a right, then, to stop everything, continue the case indefinitely to

12

try to seek evidence for a *potential* RJA claim.  I do disagree with you with that.  I'm not the final word."

Defendant timely appealed.

III.

DISCUSSION

A.  *Denial of Continuance*

Defendant contends the trial court abused its discretion by denying his request for a continuance at his resentencing hearing to investigate potential claims under the RJA. He claims the error deprived him of his federal constitutional right to the effective assistance of counsel and that reversal is required to allow "sufficient time to investigate any claims to be raised under the [RJA]."

Effective January 1, 2021, the RJA permits a criminal defendant to challenge a conviction or sentence on the ground that it was obtained "on the basis of race, ethnicity, or national origin."  (§ 745, subd. (a); Stats. 2020, ch. 317, § 3.5.)  "The Act sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)."  (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147 (*Young*).)  A defendant may establish a violation by proving, by a preponderance of the evidence, that "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people

13

that share the defendant's race, . . . than on defendants of other races, . . . in the county where the sentence was imposed."  (§ 745, subd. (a)(4)(A).)

"When it was first passed, the RJA applied only prospectively, to cases in which judgment had not yet been entered as of the [RJA]'s effective date of January 1, 2021." (*People v. Wilson* (2024) 16 Cal.5th 874, 946 (*Wilson*).)  "But in 2022, the Legislature extended the [RJA] to additional categories of cases, effective at various points over the next several years."  (*Wilson*, at p. 946.)  As relevant here, the 2022 amendments, which became effective January 1, 2023, made the RJA retroactively applicable to all cases in which the judgments were not final.  (*Wilson*, at p. 946; *People v. Lashon* (2024) 98 Cal.App.5th 804, 810 (*Lashon*).)

The statute also provides a discovery mechanism:  "A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state.  A motion filed under this section shall describe the type of records or information the defendant seeks.  Upon a showing of good cause, the court shall order the records to be released."  (§ 745, subd. (d).)  "[I]n order to establish good cause for discovery under the [RJA], a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred' in his case."  (*Young*, *supra*, 79 Cal.App.5th at p. 159.)

"[A]lthough the plausible justification standard is 'minimal,' it must still be 'based on specific facts.'  [Citation.]  Thus, preparing a discovery motion under the [RJA]

14

necessarily entails a fairly thorough review of the trial record for any remarks or conduct by the trial judge, attorneys, experts, jurors, and law enforcement officers that may plausibly support the conclusion that a . . . violation ' "could or might have occurred" in [the] case.' " (*Garcia*, *supra*, 85 Cal.App.5th 290, 297.)

Continuances of any criminal hearing "shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) "Whether good cause exists is a question for the trial court's discretion but requires at a minimum that the party seeking continuance demonstrate it has prepared for the hearing with *due diligence*." (*People v. Johnson* (2013) 218 Cal.App.4th 938, 942, italics added.) Given the breadth of the trial court's discretion, " 'only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 934 (*Alexander*).) The party challenging the trial court's continuance ruling bears the heavy burden of establishing an abuse of discretion. (*People v. Beames* (2007) 40 Cal.4th 907, 920.) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

Here, contrary to defendant's contentions, the trial court did not abuse its discretion or violate his constitutional rights by denying his request for a continuance at the section 1172.75 full resentencing hearing. Defense counsel failed to exercise due diligence to prepare for the hearing and his request for a continuance was based on grounds that were vague, speculative, and unsupported by good cause. First, defense

15

counsel did not demonstrate that he had prepared for the hearing with due diligence or that good cause existed for a continuance. Defense counsel made his oral request for a continuance on the day of the full resentencing hearing, which was held on October 18, 2024 and had been continued since May 20, 2024, and the only justification for the continuance was to investigate a *potential* RJA violation. However, defendant had long been on notice of the RJA given that the full resentencing hearing took place on October 18, 2024, but the RJA had been enacted in January 2021, nearly three years earlier. (*Lashon*, *supra*, 98 Cal.App.5th at p. 810.) The RJA retroactively applied to non-final cases, such as defendant's case, as of January 2023, which was nearly two years prior to the full resentencing hearing. (*Lashon*, at p. 810.)

Second, defense counsel's only justification for the continuance was to "look[ ] into the Racial Justice Act" for the torture-murder special circumstance and to "pursue *potentially*" a claim under section 745, subdivision (a)(3) or (4). He stated he "need[ed] to get discovery" to "then investigate *if* there is a claim." Defense counsel did not present a reasonable excuse for delaying the investigation of a potential RJA claim. Defense counsel's assertions were not sufficient to establish due diligence. After all, the RJA's retroactive amendment had been enacted more than a year earlier. And defense counsel had known of defendant's lengthy prison sentence of life without the possibility of parole and the special circumstances findings prior to the October 18, 2024, full resentencing hearing. Despite all this, defense counsel chose not to investigate a potential RJA claim until immediately before the resentencing hearing, after the hearing had already been

16

continued by five months. There was no abuse of discretion in denying the continuance request to investigate a "potential" RJA claim. (See, e.g., *People v. Sakarias* (2000) 22 Cal.4th 596, 646–647 [no abuse of discretion to deny request for continuance to prepare motion for new trial where defense counsel had ample time to prepare and gave no explanation for why he had not used available time to prepare].)

Additionally, in California, victims have a right to a prompt conclusion of the case. (Cal. Const., art. I, § 28, subd. (b)(9); § 679.02, subd. (a)(10).) By the time of the continued resentencing hearing, more than 11 years had elapsed since the commission of the charged offense. On this record, the trial court acted well within its discretion in denying defendant's motion for a continuance. (See *Alexander*, *supra*, 49 Cal.4th at p. 935.)

Defendant's reliance on *Garcia*, *supra*, 85 Cal.App.5th 290 is misplaced. In *Garcia*, the Court of Appeal reversed a trial court order denying a continuance of sentencing that was requested, in part, for investigation of a RJA claim. (*Id.* at pp. 294, 297.) In that case, new counsel was appointed for the defendant on remand for resentencing. And counsel had less than a week after her appointment "to familiarize herself with the case, prepare the sentencing brief, and marshal facts for and prepare a motion for discovery under the RJA." (*Id.* at p. 297.) The *Garcia* court concluded that the one-week period was insufficient and that the "defendant should have been given a reasonable opportunity to review the trial record and gather relevant information to prepare a motion for discovery." (*Ibid.*)

17

Here, the record does not reflect the date new defense counsel started representing defendant. Defendant merely stated on the record that he "just got the case." However, defense counsel never asserted when he "got the case" or any information showing he was unable to research a potential RJA claim prior to the October 2024 full resentencing hearing. The matter was continued since May 2024 and defense counsel could have obtained the case several months before the October 18, 2024, full resentencing hearing. Defense counsel was an experienced attorney from the Riverside Public Defender's Office and could have had approximately five months to investigate a potential RJA claim, or to otherwise advance the requisite "plausible factual foundation" for a claim under the RJA. (*Young*, *supra*, 79 Cal.App.5th at p. 159.)

Furthermore, this case is distinguishable from *Garcia*, *supra*, 85 Cal.App.5th 290, where the record showed counsel was appointed less than a week before the sentencing hearing. (*Id.* at p. 294.) In addition, in denying the request, the trial court recognized that defense counsel "did not have 'time to really flesh out the statistics' " to demonstrate racial bias. (*Id.* at p. 295.) The defense attorney in *Garcia* had filed a motion to continue the hearing as well as a sentencing brief that included citations and attachments to "various reports, articles, and research on racial disparities in the criminal justice system." (*Id.* at p. 294.) Unlike *Garcia*, which involved a showing of due diligence by means of a specific and supported request for a continuance, defense counsel in this case did not offer any facts or evidence in support of a potential RJA claim.

Because defendant's counsel did not articulate a reason for his delay in seeking to investigate a potential RJA claim, we find no abuse of discretion in the trial court's conclusion that no good cause had been shown to warrant a continuance of the already continued full resentencing hearing. (See *Alexander*, *supra*, 49 Cal.4th at p. 934.)[4] For these same reasons, we find no merit in defendant's additional contention that denial of the continuance deprived him of the effective assistance of counsel and due process. (See, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 70 ["a trial court may not exercise its discretion over continuances so as to deprive the defendant or his attorneys of a reasonable opportunity to prepare"]; *Alexander*, at pp. 935-936 [rejecting claim that denial of continuance violated federal constitutional rights because trial court acted reasonably in its denial].)

B. *Correction of Abstract of Judgment*

Defendant contends the abstract of judgment should be corrected to reflect the trial court suspended the restitution fine at the October 18, 2024, resentencing hearing. The People agree, as do we.

---

[4] On appeal, as in the trial court, defendant identifies no barrier to pursuing his RJA claim after judgment. (See, e.g., *People v. Wilson* (2024) 16 Cal.5th 874, 960 [holding that defendant had not "demonstrated that any legal or practical obstacle will delay or prevent him from raising his extra record RJA claims through the usual means of a petition for writ of habeas corpus"].) Section 745, subdivision (b), expressly authorizes a defendant to file a petition for a writ of habeas corpus alleging a violation of the RJA. Under section 1473, subdivision (e), if such a petition is based on "new discovery provided by the state or other new evidence that could not have been previously known by the petitioner with due diligence," the petition "shall not be deemed a successive or abusive petition."

At the October 18, 2024, full resentencing hearing, the trial court suspended the restitution fine originally imposed. The court specifically stated, "I will suspend any victim restitution fines due to inability to pay. . . ." The court ordered the abstract of judgment to be amended accordingly. However, the third amended abstract of judgment filed October 25, 2024, does not reflect the restitution fine as being suspended. The third abstract of judgment shows a restitution fine in the amount of $10,000 pursuant to section 1202.4, subdivision (b), and *victim* restitution per section 1202.4, subdivision (f), in the amount of $4,156.81 to the restitution fund.

Defendant seeks to amend the abstract of judgment pertaining to the restitution fine in the amount of $10,000 only based on the trial court's oral pronouncement to suspend the restitution fine based on an ability-to-pay finding. Defendant is correct. Although the trial court stated it would "suspend any *victim* restitution fines due to inability to pay," section 1202.4, subdivision (g), provides, a " 'defendant's inability to pay shall not be a consideration in determining the amount of a [victim] restitution order.' " (*People v. Allen* (2019) 41 Cal.App.5th 312, 322, quoting § 1202.4, subd. (g); accord *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["a defendant's ability to pay victim restitution is not a proper factor to consider in setting a [victim] restitution award"]; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338 [same].) Thus, a defendant's ability to pay should not be considered in ordering *victim* restitution. However, it can be considered when ordering the $10,000 restitution fine. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164.) It appears the trial court suspended the

$10,000 restitution fine based on defendant's inability to pay and not the victim restitution fine in the amount of $4,156.81 under section 1202.4, subdivision (f) to the restitution fund.

Generally, when the court's oral pronouncement of judgment and the abstract of judgment conflict, the oral pronouncement prevails. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070.) This is because the abstract of judgment is not itself the judgment of conviction but merely a summary of the judgment. (*Ibid*.) "Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error." (*People v. Leon* (2020) 8 Cal.5th 831, 855.)

We agree this general rule applies here, and the third abstract of judgment reflects a clerical error in the recording of the court's judgment. The oral pronouncement of judgment demonstrates the sentencing court suspended the restitution fine based on defendant's ability to pay. Hence, the third abstract of judgment must be corrected to reflect the trial court's oral pronouncement of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we will order the trial court to issue a corrected abstract of judgment.

IV.

DISPOSITION

The trial court is directed to amend the third abstract of judgment to reflect the $10,000 restitution fine was suspended, to prepare a corrected abstract of judgment, and

to forward a certified copy to the Department of Corrections and Rehabilitation to reflect the oral pronouncement of judgment.  In all other respects, the post judgment order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.