Filed 4/28/26  P. v. Frazier CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B334385 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA103783) |
| v. | |
| JOSHUA LAMARR FRAZIER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard M. Goul, Judge.  Affirmed.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

A jury convicted defendant and appellant Joshua Lamarr Frazier of nine felony sex offenses, including four counts of aggravated sexual assault of a child under the age of 14. Defendant contends the trial court prejudicially erred in failing to instruct the jury on lesser included offenses on seven of the nine counts. He requests we reverse the convictions on those seven counts, or alternatively, that we modify the judgment by reducing the convictions to the lesser offenses. We find no prejudicial instructional error, and therefore affirm the judgment of conviction in its entirety.

## FACTUAL AND PROCEDURAL SUMMARY

Kiara B. was born in November 2004. When Kiara was approximately four or five years old, defendant began a relationship with Kiara's mother, Sakia J. Defendant began living with Kiara and her mother, and Sakia and defendant eventually had four children together. Kiara saw defendant as a "father figure" and one of her primary caregivers. Defendant started sexually abusing Kiara when she was approximately six years old and the family was living in Las Vegas, Nevada. The abuse continued after the family moved to Long Beach, California. Kiara first reported the ongoing abuse to her mother in March of 2016.

After taking Kiara to the hospital to be examined, Sakia called the police and reported the abuse. Defendant was arrested on or about March 16, 2016. He was 29 years old at the time—more than 15 years older than Kiara.

Following his arrest, defendant made numerous admissions of guilt. He said he had been having sexual contact with Kiara since she was about four years old. The sexual relationship first started while they were living in Las Vegas, and included oral copulation (he was not sure how many times but it was "a lot"),

2

vaginal sex (no less than five times), and anal sex (no less than five times). Defendant said he did not like condoms, so he preferred engaging in anal sex to prevent the possibility of pregnancy.

Defendant elaborated on his initial statements during a second recorded interview with Detective Rubi Castro, a detective in the child abuse unit of the Long Beach Police Department. Defendant said the sexual contact began in Las Vegas when Kiara was six years old, and not four years old as he initially stated. He repeatedly told Detective Castro that Kiara initiated the contact, putting her hands in his pants, coming into his room when he was asleep and trying to lie down with him. He said it "just kept happening like that."

Defendant said initially he engaged in oral copulation with Kiara and nothing else, but then it progressed to anal sex. Defendant admitted they had sexual intercourse numerous times and it had been "going on for a year." According to defendant, they did not have vaginal intercourse until Kiara's eleventh birthday. Defendant admitted the most recent act of vaginal intercourse occurred when Sakia had been hospitalized in February 2016. Defendant said he tried to tell Kiara it was wrong for them to be having sex, but she did not care, it was "what she wants." Defendant claimed Kiara told him she never wanted it to stop, and asked him to promise he would never do it with her siblings. Defendant said he realized he was "being sex played by a child." He described Kiara as sometimes acting like "a woman scorned."

Detective Castro also interviewed Kiara. The recorded interview took place on March 16, 2016. Several days later, a forensic interview of Kiara was conducted by an expert in interviewing child victims. Detective Castro was also present.

3

Kiara's responses were substantially consistent with the information she had already given to Detective Castro.

Kiara said she was 11 years old. She explained that defendant started abusing her by touching her private parts when she was just six years old. They were living in Las Vegas at the time. When Kiara was around nine years old, they moved to Long Beach. She knew the move took place before the start of the new school year and she was "about to be a fourth grader." Once they were in Long Beach, defendant started touching Kiara with his penis. If she was on the bed, Kiara would try to "scoot" away, but defendant would grab her and pull her back. It seemed like whenever her mother left the apartment, he would try to do stuff with her. Defendant would pull his pants down and make Kiara pull her pants down. Defendant would then put "his stuff in [her] stuff." He often took Kiara into the bathroom in their apartment when he wanted to abuse her, and sometimes he pushed her to the floor. The first time it occurred, Kiara was nine years old.

Towards the end of the interview, Kiara recalled several incidents of anal sex in the bathroom, as well as acts of oral copulation. Defendant would push Kiara onto her knees, grab her ponytail, put his penis in her mouth, and "pull [her] head back and forth." She said she was 10 years old when that started to happen.

Kiara explained she was afraid of defendant, saying he "would kind of like threaten me." Defendant told her they would get in trouble if she told anyone what was going on. He also said he would hurt her mom, her mom would think it was Kiara's fault, and then she would also hurt her.

Defendant was charged with nine felony sex offenses: two counts of sexual intercourse or sodomy with a child 10 years old

or younger (Pen. Code, § 288.7, subd. (a);[1] counts 1 & 2); two counts of aggravated sexual assault/rape of a child under the age of 14 while defendant was seven or more years older than the victim (§§ 269, subd. (a)(1), 261, subd. (a)(2) & (6); counts 3 & 4); aggravated sexual assault/sodomy of a child under the age of 14 while defendant was seven or more years older than the victim (§§ 269, subd. (a)(3), 286, subd. (c)(2) & (3); count 5); two counts of lewd act upon a child (§ 288, subd. (a); counts 6 & 7); oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b); count 8); and aggravated sexual assault/oral copulation of a child under the age of 14 while defendant was seven or more years older than the victim (§§ 269, subd. (a)(4), 287, subds. (c)(2) & (3) [former § 288a]; count 9).

The jury trial began in October 2023.

Sakia testified that Kiara was born in November 2004. She explained that after she began her relationship with defendant, they moved in together and she had four children with him. Kiara's four half-siblings were a girl born in March 2011, another girl born in March 2012, a boy born in October 2013, and another girl born in January 2015. The family lived for a period of time in Las Vegas, and then they moved to an apartment in Long Beach in July 2013. Defendant was often left in charge of the children.

After Kiara confided in her that defendant was abusing her, Sakia confronted defendant. He initially denied it. However, defendant eventually admitted the abuse was occurring, and he told Sakia that Kiara was not lying. Defendant said they could "fix" it. They just needed to tell Kiara to say that

---

[1]     All undesignated statutory references are to the Penal Code.

she lied and he could get help or therapy.  Sakia left the house and called the police to report the abuse.

Kiara testified she was born in November 2004.  She said defendant began abusing her while they were living in Las Vegas.  It would occur when her mother would go somewhere like the store.  She recalled incidents where defendant would start touching her private parts while they were sitting on the couch watching cartoons.

Kiara said the family eventually moved to Long Beach.  She could not recall when they moved, saying it was all "kind of like a blur."  But after the move, Kiara said the abuse "progressed" with defendant starting to touch her "using his penis."  Kiara could not say exactly when the first incident of vaginal penetration happened, but it occurred in the bathroom of the apartment.  She tried to walk away, but he pulled her back and pinned her hands against the wall above her head.  Defendant first used his fingers and then his penis.  Afterward, he told her not to say anything.  He said that if she did, her mother would not believe her, her siblings would be sent to a group home, and everyone would be separated.

Kiara testified to additional acts of abuse, including vaginal intercourse on her 11th birthday and when her mother was hospitalized for several days, as well as multiple acts of sodomy and oral copulation.  Kiara explained that when she was first being interviewed about what happened, sometimes she would not explain everything that occurred because talking about the abuse made her feel really uncomfortable.

When asked why she did not tell her mother sooner about what was going on, Kiara said she was scared.  She did not want to "tear apart my family."  It was upsetting and scary to have a person she thought she could trust use that power against her.

Kiara also felt she was too young to even be able to articulate what was happening.

The jury convicted defendant on all nine counts. The court sentenced defendant to a term of 95 years to life, calculated as follows: consecutive terms of 25 years to life on each of counts 1 and 2, plus consecutive terms of 15 years to life on each of counts 3, 4 and 9. The court imposed and stayed 15 to life terms on counts 5 and 8, and imposed concurrent six-year middle terms on counts 6 and 7. Defendant was awarded 3,247 days of presentence custody credits (2,823 actual, 424 conduct).

This appeal followed.

## DISCUSSION

Defendant contends the trial court committed instructional error by failing to instruct on lesser included offenses on counts 1 through 5, and counts 8 and 9. Our review is de novo. (*People v. Wilson* (2021) 11 Cal.5th 259, 295 (*Wilson*).) We conclude that to the extent there was any instructional error, it was harmless.

### 1. Duty to instruct on lesser included offenses

The trial court in a criminal case has a sua sponte duty to instruct "on all lesser included offenses the evidence warrants, even against the defense's wishes. Such instructions are required when, but only when, a jury could reasonably conclude that the defendant committed the lesser offense but not the greater one." (*People v. Hardy* (2018) 5 Cal.5th 56, 98; *Wilson, supra,* 11 Cal.5th at p. 295.) Instruction on a lesser included offense is necessary " ' " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " ' " (*Wilson,* at p. 295, quoting *People v. Valdez* (2004) 32 Cal.4th 73, 115.)

The evidence supporting instruction on a lesser included offense must be substantial. (*People v. Souza* (2012) 54 Cal.4th 90, 116.) Weak or purely speculative evidence does not suffice. (*Ibid.*; accord, *People v. Avila* (2009) 46 Cal.4th 680, 705–706.) In other words, there must be substantial, credible evidence " 'from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' " (*Souza*, at p. 116.)

In assessing whether the evidence is substantial enough to warrant an instruction on a lesser included offense, we are mindful that, in this context, we determine only the "bare legal sufficiency" of the evidence and "not its weight." (*People v. Breverman* (1998) 19 Cal.4th 142, 177 (*Breverman*).) Moreover, doubts about whether an instruction is warranted should be resolved in favor of the accused. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

**2.     Counts 3, 4, 5 and 9**

Defendant was convicted of four counts of aggravated sexual assault of a child under the age of 14. The aggravated assaults in counts 3 and 4 were based on forcible rape (§§ 269, subd. (a)(1), 261, subd. (a)(2)). In count 5, the aggravated assault was based on an act of forcible sodomy (§§ 269, subd. (a)(3), 286, subd. (c)(2)(A)), and in count 9, it was based on forcible oral copulation (§§ 269, subd. (a)(4), 287, subd. (c)(2)(A) [former § 288a]). Defendant contends the jury should have been instructed on all four of these counts with the lesser included nonforcible offenses of unlawful sexual intercourse with a minor under the age of 18 (§ 261.5, subd. (c)), unlawful sodomy with a minor under the age of 18 (§ 286, subd. (b)(1)), and unlawful oral copulation with a minor under the age of 18 (§ 287, subd. (b)(1)).

The People concede the nonforcible offenses are lesser included offenses to the aggravated counts charged in counts 3, 4, 5 and 9, but argue there was no substantial evidence warranting instruction on those lesser offenses. Alternatively, the People contend any error was harmless.

In asserting there was substantial evidence supporting instructions on the lesser included offenses, defendant chiefly points to his own pretrial statements to law enforcement. While defendant admitted he was having sexual contact with Kiara and had been for some time, defendant repeatedly made comments to the effect that Kiara initiated the contact and that he was not forcing her to engage in such conduct.

We need not resolve whether the evidence is substantial enough to have warranted instructing the jury on any nonforcible lesser offenses. Even assuming for the sake of argument that instructions on lesser included offenses should have been given, we conclude any instructional error was harmless.

Prejudice arising from the failure to instruct on a lesser included offense in a noncapital case is assessed under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Schuller* (2023) 15 Cal.5th 237, 260 (*Schuller*); *Breverman*, *supra*, 19 Cal.4th at p. 165; *People v. Banks* (2014) 59 Cal.4th 1113, 1161 (*Banks*), overruled in part on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391; see also Cal. Const., art. VI, § 13.) We do not reverse unless examination of the record demonstrates a reasonable probability the instructional error affected the outcome. (*Breverman*, at p. 165; *Watson*, at p. 836.)

Moreover, a finding that substantial evidence exists in the record to warrant an instruction on a lesser included offense does *not* resolve the separate question of whether the failure to so instruct was prejudicial. (*Breverman*, *supra*, 19 Cal.4th at

pp. 177–178; accord, *Banks*, *supra*, 59 Cal.4th at p. 1161; *People v. Beames* (2007) 40 Cal.4th 907, 929 (*Beames*).) "[T]he two standards of evidentiary review are distinct." (*Breverman*, at p. 177.)

As we explained above, the duty to instruct on a lesser included offense arises whenever there is substantial evidence a reasonable jury could conclude the lesser offense was committed. (*Breverman*, *supra*, 19 Cal.4th at p. 177.) But, we take "an entirely different view of the evidence" when assessing error under *Watson*. (*Breverman*, at p. 177.) Posttrial review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177.)

Here, the evidence supporting the jury's verdicts on the aggravated sexual assault charges in counts 3, 4, 5 and 9 was overwhelming.

Aggravated assault by rape is defined in section 261, subdivision (a)(2), as sexual penetration "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." Aggravated assault by sodomy or forcible oral copulation contains the same definition. (§§ 286, subd. (c)(2)(A), 287, subd. (c)(2)(A).)

Force in this context is simply conduct that overcomes the will of the victim. (See, e.g., CALCRIM Nos. 1000, 1015 & 1030.)

Sufficient force to satisfy the statute includes acts by the defendant of grabbing, holding, or restraining the victim that occur in conjunction with the abusive acts themselves. (*People v. Morales* (2018) 29 Cal.App.5th 471, 480 (*Morales*); *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1024 (*Garcia*); *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 (*Alvarez*).)

Duress is defined as the use of "a direct or implied threat of force, violence, danger, hardship, or retribution." (CALCRIM Nos. 1000, 1015 & 1030.) Relevant considerations to a finding of duress include "the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the relative physical vulnerability of the child." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).)

Kiara's testimony demonstrated overwhelming evidence that all four counts were committed with the requisite force and/or duress.

The rape in count 3 occurred on the couch in the family home on Kiara's 11th birthday. Kiara testified they had been sitting on the couch watching a movie. When the movie ended, defendant put her on his lap and vaginally penetrated her with his penis. She said it was "the most painful thing" she had experienced. She did not recall saying anything to defendant, but she remembered crying. Kiara said, "[N]othing was ever said, like, during. But after he would tell me not to tell anyone." Kiara felt she had no choice but to go along. She tried to just not think about anything at all and wait for it to be over. Defendant told her that if she said anything, it would "mess up everyone's lives."

The rape in count 4 occurred when Kiara's mother was in the hospital in February 2016. Defendant woke up Kiara and took her to sleep with him. When she was lying on the bed, defendant spread her legs apart and penetrated her. She cried and covered her face with a sheet.

Count 5 was based on an act of sodomy that took place in the bathroom of the apartment in Long Beach. Kiara testified that defendant told her to bend down and touch her toes and then he penetrated her from behind. It was painful and she cried and asked him to stop, to no avail.

Count 9 was based on an act of forcible oral copulation that also took place in the bathroom of the apartment. Kiara testified she did not feel she could say no to defendant. She explained her feelings as follows: "I just felt like I was powerless, honestly. I never really tried to fight back because I didn't know if he was going to hurt me. Because whenever—like, whenever it would happen, it was like he was a different person, you know, not like the father figure, so I just didn't want to, like, make him mad or anything." Kiara said defendant would sometimes grab and hold onto her ponytail. She said it hurt and she did not feel like she could get away.

In contrast to the strength of the above evidence, the evidence suggesting a lack of force or duress was so comparatively weak there was no reasonable probability the claimed instructional error affected the verdict. (*Beames*, *supra*, 40 Cal.4th at p. 929; *Breverman*, *supra*, 19 Cal.4th at p. 177.)

Defendant relies in large part on his own pretrial admissions asserting that Kiara was the one who initiated the contact, even when she was just six years old. He referred to Kiara, a young girl not yet a teenager, as "playing" him and acting like a "scorned" woman.

Defendant also argues that even if Kiara's testimony suggested the use of force, she never said that defendant "applied force." The law does not require the victim to testify to a specific application of force. Kiara's testimony as to each count included testimony about defendant moving, holding or positioning her against her will, or refusing to stop when she asked him to. Such testimony was more than sufficient. (*Morales*, *supra*, 29 Cal.App.5th at p. 480; *Garcia*, *supra*, 247 Cal.App.4th at p. 1024; *Alvarez*, *supra*, 178 Cal.App.4th at p. 1005.)

There was also significant testimony about the fear and duress Kiara felt to comply with defendant's demands. Defendant was a father figure and a primary caregiver that Kiara had lived with since she was four or five years old. Defendant repeatedly told Kiara not to tell anyone and made various threats about getting into trouble if she did, that she would not be believed, and that it would result in her siblings and the family being split up. Moreover, in addition to the difference in their ages and size, there was evidence Kiara witnessed defendant hitting and choking her mother when they argued and therefore had reason to fear him. Thus, there was comparatively strong evidence of duress within the meaning of the statutory language with relatively weak evidence of rape, sodomy or oral copulation without duress. (*Thomas*, *supra*, 15 Cal.App.5th at p. 1072.)

### 3.   Counts 1, 2 and 8

Defendant was convicted of committing multiple acts of sexual abuse of a child 10 years old or younger—acts which are punished more severely because of the age of the victim. In count 1, defendant was convicted of sodomy (§ 288.7, subd. (a)), in count 2, sexual intercourse (§ 288.7, subd. (a)), and in count 8, oral copulation (§ 288.7, subd. (b)).

13

Defendant contends there was conflicting testimony concerning Kiara's age at the times relevant to counts 1, 2, and 8. Defendant primarily points to inconsistencies in Kiara's pretrial statements and trial testimony which, he says, raised a reasonable inference she may not have been 10 years old or younger at the times the acts in counts 1, 2 and 8 were committed. Defendant therefore contends, based on how the counts were alleged, the court should have instructed with unlawful sodomy with a minor under the age of 18 (§ 286, subd. (b)(1)), unlawful sexual intercourse with a minor under the age of 18 (§ 261.5, subd. (c)), and unlawful oral copulation with a minor under the age of 18 (§ 287, subd. (b)(1)). The People argue there was no substantial evidence warranting instruction on lesser included offenses, and even if there was, any error was harmless.

Once again, even if we assume, without finding, that instruction on lesser included offenses was warranted as to these three counts, we conclude any error in failing to so instruct was harmless. (*Schuller*, *supra*, 15 Cal.5th at p. 260; *Breverman*, *supra*, 19 Cal.4th at pp. 177–178.)

There was ample evidence supporting the jury's verdicts of guilt on counts 1, 2 and 8, all of which were based on conduct that occurred from July 2013 when the family moved to Long Beach, up until Kiara's 11th birthday in November 2015.

Both Sakia and Kiara testified that Kiara was born in November 2004. Sakia's testimony established the family moved to Long Beach in July 2013, when Kiara was just nine years old. Kiara's statements during the pretrial forensic interview were consistent on this point.

Kiara testified she could not recall the exact date of the first act of sodomy that formed the basis for count 1. But, she

14

explained the basic timeframe by making reference to the ages of two of her half-siblings, whose birthdates were established by Sakia's testimony.  Kiara said she remembered the incident occurred when her youngest half-sibling was a small baby sleeping in a crib.  Her youngest half-sibling was her sister born in January 2015, almost a year *before* Kiara turned 11.  In addition, during her forensic interview, Kiara said this incident occurred when her half-brother was not yet two.  Kiara's half-brother would have turned two in October 2015, one month *before* Kiara turned 11.

Admissions by defendant corroborated Kiara's testimony about the timeframe when the first act of sodomy occurred. Defendant admitted in March 2016 that sexual intercourse started out with Kiara as anal sex, that they had anal sex at least five times, and it had been "going on for a year."  Therefore, based on defendant's own statements, he had been having anal sex with Kiara for several months before she turned 11 in November 2015.

With respect to count 2, Kiara also could not recall the exact date of when defendant pinned her against the bathroom wall and vaginally penetrated her with his penis.  But Kiara testified that once they moved to Long Beach when she was nine years old, the abuse "progressed" with defendant starting to touch her "using his penis."  In both her initial interview with Detective Castro and the followup forensic interview, Kiara said the vaginal penetration started in the bathroom in Long Beach when she was nine years old.

Count 8 involved an incident of oral copulation that also took place in the bathroom of the family's Long Beach apartment. During the forensic interview, Kiara said she was 10 years old when defendant began putting his penis in her mouth. Defendant's admissions also corroborate the timing of this

15

incident.  Defendant admitted his abuse of Kiara started when she was just six years old, and he explained that for a long time it consisted only of oral copulation, until it progressed to anal and vaginal sex.

In contrast, the evidence defendant relies on to argue that Kiara may have been older than 10 when counts 1, 2 and 8 were committed is comparatively weak.

Defendant says there were inconsistencies in Kiara's testimony, pointing chiefly to her testimony at the preliminary hearing held in January 2016.  When asked her age, Kiara said she was 12, even though she would not turn 12 until November of that year.  When this testimony was pointed out to her at trial, Kiara said she was "pretty sure" about her age, and no further clarification was sought.  Defendant also cites to Kiara's statement describing everything as "kind of a blur."  But Kiara made that statement not in response to a question about her age or birthdate, but when she was asked if she knew the date the family moved to Long Beach.  She was able to later clarify that she remembered they moved in the summer before she started fourth grade.

Defendant points to some additional testimony raising an inference that the first act of vaginal penetration, relevant to count 2, may have occurred when Kiara was at least 11 years old.  Defendant cites to his own pretrial admissions in which he explained that he first had vaginal sex with Kiara on her 11th birthday, and that all of their prior sexual contact had been oral copulation or anal sex.

In addition, defendant points to the testimony of Officer Nathan Kane.  Officer Kane was a patrol officer who reported to the hospital when Sakia took Kiara there to be examined after she disclosed the abuse.  Officer Kane testified that Kiara told

16

him defendant had been "sexually assault[ing]" her since she was six years old, but that the first time he vaginally penetrated her with his penis was when her mother had recently been hospitalized. The evidence showed Sakia was hospitalized in February 2016 when Kiara was 11. Officer Kane also testified that Kiara was "pretty shy" and "very nervous." Nothing in Officer Kane's relatively brief testimony indicated he had any particular experience dealing with children who have been sexually abused. Nor does his testimony show that his conversation with Kiara was as thorough as those conducted by Detective Castro or by the expert forensic interviewer. The testimony was not reasonably likely to be given more credence by a jury, considering the entire evidentiary record.

We conclude there is no reasonable probability the claimed instructional error affected the verdict on counts 1, 2 and 8. (*Breverman*, *supra*, 19 Cal.4th at p. 177.)

### DISPOSITION

The judgment of conviction is affirmed.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.


17